THE PEOPLE OF THE STATE OF CALIFORNIA, APPELLANT, v. WILLIAM T. COLEMAN, HENRY CARLETON, JR., AND F. M. RANDALL, RESPONDENTS.

SAME v. HUSSEY, BOND & HALE, G. B. POST & CO., THEODORE PANE, CASE, HEISER & CO., AND RALPH S. DORR, RESPONDENTS.

CONSTITUTIONAL LAW—STATE SOVEREIGNTY.—Each State is supreme within its own sphere, as an independent sovereignty.

IDEM—POWER OF STATE LEGISLATURE.—The Constitution of this State is not to be considered as a grant of power, but rather as a restriction upon the powers of the Legislature; and it is competent for the Legislature to exercise all powers not forbidden by the Constitution of the State, or delegated to the General Government, or prohibited by the Constitution of the United States.

IDEM—POWER OF TAXATION.—The power of the Legislature to tax trades, professions, and occupations, is a matter completely within its control, and rests in its sound discretion.

IDEM—EQUALITY AND UNIFORMITY OF TAXATION.—The 13th section of the 11th Article of the State Constitution, which provides that "Taxation shall be equal and uniform throughout the State," does not operate as a limitation on the taxing power of the Legislature, and apply to every species of taxation, but is to

be taken as applying only to direct taxation on property, as such. It does not require that all should be taxed alike. The Legislature, in its discretion, may, therefore, discriminate in the imposition of taxes on certain classes of persons, occupations, or species of property, taxing some and exempting others.

IDEM—RULES OF CONSTRUCTION.—It is a safe rule of construction that, when the Convention, in framing the organic law of the State, thought proper to borrow provisions from the Constitutions of other States, which provisions had already received a judicial construction, they adopted them in view of such construction, and acquiesced in its correctness.

REVENUE ACT, CONSTITUTIONAL.—* The Revenue Act of May, 1853, does [47] not violate that provision of the State Constitution which provides that all laws of a general nature shall be uniform in their operation. By a uniform operation, it was intended that laws of this character should, as near as possible, affect persons and property alike. A perfectly equal tax law is impossible, from the very nature of the subject.

CONSTITUTIONAL LAW, REGULATION OF COMMERCE.—That part of the law which provides, 1st, that all goods, wares, etc., brought into the State, from any other State or foreign country, to be sold in this State, owned by any person not domiciled in the State, shall be declared consigned goods; and, 2d, that every person selling such consigned goods, shall be taxed 60 cents on every $100 worth of goods so sold (such tax to be paid by the seller of the goods, he having a lien for the same), does not violate those provisions of the Constitution of the United States, which declare, 1st, that Congress shall have power to regulate commerce with foreign nations and among the several States, and with the Indian tribes; 2d, that no State shall, without the consent of Congress, levy any impost, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.

IDEM—POWER OF TAXATION.—The taxing power is an incident of sovereignty, the exercise of which belongs exclusively to every State, and attaches alike upon everything which comes within its jurisdiction.

FEDERAL AND STATE—POWERS CONCURRENT.—By well settled rules of construction, the right of the States to regulate commerce is concurrent with that of Congress—with the understanding always, that all State regulations, inconsistent with those of the Federal Government on this subject, must give way.

STATE SOVEREIGNTY—INTERNAL COMMERCE.—The whole doctrine of *Brown* v. *The State of Maryland* has been doubted, and the right of the States to regulate their own internal commerce, and to tax every species of property within their own jurisdiction—nay, more, the concurrent power of the States over the subject of commerce, is now firmly established by the opinion of a majority of the Judges of the Supreme Court of the United States.

NOTE.—Cited Constitutional construction, power of State Legislature, in *Thorne* v. *San Francisco, post,* 157, 162; *Thompson* v. *Williams,* 6 Cal. 89; *Wilson* v. *Broder,* 10 Cal. 489; *People* v. *Rogers,* 13 Cal. 165; *Cohen* v. *Wright,* 22 Cal. 308; *Ex parte Yale,* 24 Cal. 244; *People* v. *Webb,* 38 Cal. 477; *S. & V. R. R. Co.* v. *Stockton.* 41 Cal. 162; *Hinson* v. *Lott,* 40 Ala. 127. Commented on, power in passage of Revenue Laws, in *Crosby* v. *Patch,* 18 Cal. 443; *High* v. *Shoemaker,* 22 Cal. 369. Overruled as to constitutional limitations on power of taxation, in *People* v. *McCreery,* 34 Cal. 448, 461. See generally, *People* v. *Bigler,* 5 Cal. 23; *People* v. *Folsom,* Id. 373; *Hobart* v. *Butte Co.,* 17 Cal. 23; *People* v. *Judge of Twelfth District,* Id. 547; *Cal. St. Tel. Co.* v. *Alta Tel. Co.,* 22 Cal. 421; *Bourland* v. *Hildreth,* 26 Cal. 183; *Taylor* v. *Palmer,* 31 Cal. 254; *Santa Barbara* v. *Stearns,* 51 Cal. 501; *S. J.* v. *S. J. & S. C. R. R.,* 53 Cal. 481; *Sharon* v. *Sharon,* 67 Cal. 190. See 15 Kan. 635; 27 La. An. 146: 40 Md. 71; 9 Wis. 430; 5 Thomp. & C. 313: 3 Hun, 87.

IDEM—RIGHTS AND IMMUNITIES OF CITIZENS.—The Act of May, 1853, does not violate that clause of the Federal Constitution which guarantees to the citizens of each State the same privileges and immunities which they are entitled to in their own States.

TAXATION ON IMPORTS.—The tax is not levied on the foreign owner of consigned goods in the hands of the consignee, but only upon their sale. All other consigned goods are taxed by the system of licenses, as part of the general property of the State.

REVENUE ACT CONSTITUTIONAL.—The Revenue Act of May, 1853, is neither in derogation of the Constitution of this State, nor of the Constitution of the United States.

APPEAL from the Seventh Judicial District.

The complaints, in these several cases, against the several defendants therein, and doing business in the City of San Francisco, by designation of the Attorney General, in order to secure an impartial trial, were filed in Contra Costa [48] County, in * the ordinary form, to recover the penalties imposed by Article VI of the Revenue Act of May 18th, 1853, on auctioneers, for selling real or personal property without a license; and, also, by Article VII, on all persons neglecting or refusing to pay the taxes levied on all persons selling any consigned goods within the State; that is, all goods, wares, merchandise, etc., brought or received within this State from any other State, or from any foreign country, to be sold in this State, owned by any person or persons not domiciled in this State.

The defendants demurred to the several complaints, and assigned for error, that the whole Revenue Act of 1853, and particularly Articles VI and VII, were in direct conflict with the Constitutions of the State of California and of the United States, and, therefore, null and void. A decision, *pro forma*, was entered by the Court, sustaining the demurrer, from which decision appeals were prosecuted in this Court.

*S. C. Hastings*, Attorney-General, *Thomas, Magraw, Tilford, Hoge & Wilson*, Assistant Counsel for Appellants.

*Crockett & Page*, Attorneys for Respondents, filed no brief.

As the position taken and authorities cited by counsel for appellants, were fully adopted by the Court, they are here omitted.

Mr. Ch. J. MURRAY delivered the opinion of the Court. Mr. J. HEYDENFELDT concurred.

This appeal is prosecuted from a *pro forma* decision of the District Court of Contra Costa County.

The suit was commenced in the nature of a prosecution, to recover the penalty for a violation of the Revenue Act of 1853.

The defendants demur, on the ground that the Act in question is repugnant to the Constitution of the United States, and the Constitution of the State of California.

In approaching the consideration of this question, we cannot but regret that the public mind has been prepared for a different decision than the one we are compelled to make, after a careful consideration of the principles involved.

The exactions of Government, by way of tax or assessment, are always met with reluctance; and the citizen, too often for-* getting that they are the price of his [49] personal liberty, and the security of his property, is disposed to regard them as arbitrary impositions, from which he may properly escape by any defense or technicality.

To enable us to arrive at a correct determination of this case, it may be well to lay down, *in limine*, a few principles, which, we believe, by long acceptation, have become universally recognized as truisms, and which have not, within our knowledge, been doubted, except, perhaps, by the learned counsel for respondents.

1st. That each State is supreme within its own sphere, as an independent sovereignty.

2d. That the Constitution of this State is not to be considered as a grant of power, but rather as a restriction upon the powers of the Legislature; and that it is competent for the Legislature to exercise all powers not forbidden by the

Constitution of the State, or delegated to the General Government, or prohibited by the Constitution of the United States.

From this it follows, that the power of the Legislature to tax trades, professions, and occupations, is a matter completely within the control, and, unless inhibited by the Constitution, eminently belonging to, and resting in, the sound discretion of the Legislature. This principle has been repeatedly maintained by the Courts of almost every State in the Union, and reiterated by the decisions of the Supreme Court of the United States.

It becomes necessary, then, to inquire if this power has been withdrawn by our Constitution, from the Legislature.

This position seems to have been abandoned, upon the argument of the case. In fact, so strong are the authorities and obvious the rules of construction, that it would be almost insulting the intelligence of any respectable tribunal to contend for it.

But it is contended that, conceding this power to tax occupations and professions, it has been limited by the 13th section of the 11th Article of the Constitution, which provides that "Taxation shall be equal and uniform throughout the State. All property shall be taxed in proportion [50] to its value, to be * ascertained as directed by law; but Assessors and Collectors of town, county and State taxes shall be elected by the qualified electors of the district, county or town in which the property taxed for State, county or town purposes is situated."

Do the words "shall be equal and uniform," operate as a limitation upon the taxing power of the Legislature, and apply to every species of taxation to which Government may resort for the maintenance of itself, or are they to be taken as applying only to direct taxation upon property, as such, and intended to prevent the Legislature from fixing an arbitrary standard as to kind or quality, by providing that it shall be taxed in proportion to its value, to be ascertained as directed by law?

In determining this point, much weight should be given

to the interpretation of similar provisions in the Constitutions of other States, by their legal tribunals.

It is a safe rule of construction, that, when framing the organic law of this State, the Convention thought proper to borrow provisions from the Constitutions of other States, which provisions had already received a judicial construction, they adopted the provisions in view of such construction, and acquiesced in its correctness.

By reference to the Debates of the Constitutional Convention, pages 256, 364 and 375, it will be observed that the original section read: "All lands liable to taxation in this State," etc. A motion was made to strike out the word " lands," and insert " immovable and movable property." This section was afterwards amended so as to read " all property."

It is apparent, from a perusal of the debates on this point, that the Convention intended, in the first place, to limit the taxing power of the Legislature over the subject of real estate alone.

The jealousies of the native California citizens, and a desire to protect them from an unequal system of taxation, gave rise to all the discussion upon this subject, which resulted in substituting the word " property," and providing for the election of Assessors in each county, by the qualified electors.

The expediency of placing any limitation or restraint upon the taxing power of the Legislature, was strongly doubted, and the clause only adopted, as a pledge of security to the native * inhabitants, against imaginary   [51] cases of inequality or arbitrary exactions.

In adopting this provision as a substitute, the Convention seem to have supposed that it applied to lands only; and the member, Mr. Gwinn, who offered it, stated to the Convention that he had copied the provision from the Constitution of Texas, a State similarly situated to our own, where there were many large landholders, who owned estates which were not productive. " Taxation," he says, " should be equal and uniform; all property in this State shall be taxed in proportion to its value, to be ascertained as direct-

ed by law.   Then, if the gentlemen wish to be more specific, I am willing that the Assessors shall be residents of the county or district in which the *lands* are situated."

The Constitution of Texas, from which the provision now under consideration was taken, has received the construction of the Supreme Court of that State in the case of *Aulanier* v. *The Governor* (1 Tex. 653).

The provision is as follows: "Taxation shall be equal and uniform, and all property shall be taxed in proportion to its value," etc.

In this case, the Court say the word "property," as used by the Constitution, cannot be tortured, by any forced construction, into meaning an occupation, calling or profession; and if the first part of the section can have any control over the exercise of the power of the Legislature, it is in this way that it would restrain the enactment of a law which would make a difference, at different places in the State, on the tax imposed on the same occupation.

Here, then, we have the highest authority which the character of the case will admit of; and the Court does not contend for, or treat with serious consideration, the proposition that professions and occupations cannot be taxed, or that this clause of the Constitution was intended to apply to anything else than a direct tax upon property.

This question arose in the case of *Sawyer* v. *The City of Alton* (4 Ill. 127) under the Constitution of Illinois, which provides that "The mode of levying a tax shall be [52] by valua- * tion, so that every person shall pay a tax in proportion to the value of the property he or she has in his or her possession"; and it was contended that the Legislature could not levy any tax, unless property was the basis, and the mode of levying it by valuation; and the authority of the Legislature to impose a road tax was contested; but the Court held, that the Constitution did not limit the power of the Legislature, as to the objects of taxation, but only prescribed the mode, when the tax was to be imposed upon a particular object, and that this clause was intended to prevent an arbitrary tax on property, according to kind or quality, without regard to value.

In the case of the *Portland Bank* v. *Apthrop* (12 Mass. 252) the question arose as to the power of the Legislature to tax all bank stock.

The Constitution of Massachusetts authorized the Legislature "to impose and levy proportionate and reasonable assessments, rates and taxes upon all the inhabitants of, and persons resident, and estates lying within the Commonwealth; and, also, to impose and levy reasonable duties and excises upon any produce, goods, wares, merchandise and commodities whatsoever, brought into, produced, or being within the same."

Under the first clause of this section it was held that, as a tax upon the banks, the Act was unconstitutional; that taxes must, by the provision of this section of the Constitution, be proportionate and equal on all the persons and estates lying within the Commonwealth; that such clause required an estimate of all the property, and an assessment on each individual, according to the value of his property.

But the right to lay a specific tax upon banks was derived from the well accepted meaning of the word "commodity," which was held to signify convenience, privilege and gains, as well as goods, chattels, etc.; that the first clause did not extend to the right so to tax professions or trades, which might be taxed at the discretion of the Legislature; that "taxes of this sort must be equal, that is, they must operate upon all persons who exercise the employment so taxed."

This point came before this Court in the case of *The People* v. *Naglee* (1 Cal. 232) and the same construction was given as that held by the Supreme Court of Texas.

*It is contended, however, that the question was [53] not necessarily involved in the decision of that case, and the opinion *quoad hoc* is *obiter*. We think the point was involved in the decision; but, even if it were not, we are disposed to regard it as authority, and acquiesce in its correctness.

The reasoning of Mr. Justice BENNETT in that case is conclusive, and we adopt it as the basis of this decision.

We have found but one authority, viz: *Crow* v. *The State of Missouri* (14 Mo. 237) which sustains the position of the respondent. The reasoning of the Court in that case, is anything but clear or convincing, and its authority is impaired by the fact that it was only a majority decision.

The able opinion delivered by the dissenting Judge, to our mind, is conclusive upon the whole case.

Other decisions might be cited, but we have deemed it unnecessary. The character which this, and other similar suits have assumed, as a public and political question alone, has induced us to resort to the authority of other Courts, to find a proper construction of this clause of our Constitution.

The argument of the respondent has proceeded upon the ground, that every species of property must be taxed at a uniform and equal rate; that, admitting the power of the Legislature to tax occupations, they must be taxed at an equal and uniform rate, or by "some standard or basis applicable alike to all occupations, and having reference to value. How this is to be done," say the learned counsel, "is no part of our province to decide; nor are we to say whether it is possible to devise an occupation tax which would be *equal* and *uniform*, unless it be a tax levied equally, and for the same amount, upon all occupations. All that we maintain is, that an occupation tax, which is not equal and uniform, violates the Constitution."

Is, then, the clause under consideration so vague, as to be wholly unsusceptible of a practical meaning, and the force of the provision to be defeated, from a want of some indefinable equality and uniformity existing in the imagination of learned counsel, but so subtle in its character as to defy the ordinary use of language in its description?

In construing this section, force and meaning must be given *to every part of it. We cannot suppose the Convention intended to enact, as a part of the fundamental law of this State, a provision so doubtful and ambiguous, and, at the same time, so completely calculated to paralyze the energies and prostrate the resources of the State Government.

If the position contended for by the respondent be correct, then all property must be taxed, and the Legislature would have no authority to exempt any species of property from taxation; yet the power of the Legislature to exempt the property of religious and eleemosynary corporations has not been doubted.

It would be impossible for the State to protect, in any manner, her own domestic interests. Agriculture, manufactures and mechanical employments must languish 'for want of the healthy discrimination and fostering care of the State Government. The occupation of the humblest artisan, with no capital but his labor, the reward of whose toil secures to him only a scanty subsistence, must be taxed equally with the richest merchant, banker or broker, or, if not equally, at least the State has no right to release the miserable pittance so cruelly wrung from his hard earnings.

In case the Legislature should desire to exempt a meritorious class of citizens, or impose the burdens of Government upon a particular class of property, they would be met by this clause of the Constitution, which makes *all property* subject to taxation. Suppose it should be necessary to raise a revenue of $300,000 on $100,000,000 of taxable property, instead of levying this tax directly upon real estate or other specific articles of taxation, which the Legislature might designate, everything must be taxed, from the surplice of the minister to the plow of the husbandman. The assessment would, necessarily, be small on each one, but the expense of collecting it would, in many instances, amount to more than the tax itself.

No such absurd consequences were ever intended. The taxing power has been rightly denominated the right arm of the Government; fetter and restrict it, as contended for in this instance, and it becomes an empty shadow, potential for evil, powerless for good.

The debates upon our Constitution show, that the Conven-*tion regarded this power as belonging to the    [55] Legislature, and trusted to their wisdom for a proper exercise of it.

It is no argument to say, that they may abuse it by arbitrary distinctions between different classes of property, or that they may totally exclude certain classes of trades and professions; for wherever power is lodged, it is subject to abuse, but this forms no solid objection to its exercise.

We cannot presume that a high co-ordinate branch of the Government will ever be actuated by any other motive than a liberal, honest and enlightened regard for the interest and welfare of the State. If they should legislate ignorantly or corruptly, a remedy may be found for it at the ballot box; but if this Court should attempt to control their discretion, or usurp their powers, there is no remedy but by revolution, or change of the Constitution.

From these considerations we are of opinion, that the words "equal and uniform" apply only to a direct tax on property; that the Legislature may select or exempt such property as, in its discretion, it may think proper; and that these words do not, by any fair rule of interpretation, extend to tax on occupation.

But it is contended that the Act of May, 1853, violates that provision of our Constitution which provides that "all laws of a general nature shall be uniform in their operation."

Much of the reasoning upon the first branch of this case, is applicable to this point. By a "uniform operation," it was intended that laws of this character should, as near as possible, affect persons and property alike. No legislation has ever yet produced a law taxing the subject for the support of Government, which really accomplished this object; from the very nature of the subject it is impossible. The citizen who is protected in $100,000 worth of improved property in the City of San Francisco, paying an income of from 15 to 30 per cent. per annum, pays no more State tax upon the same, than the one who lives in a remote portion of the State, owning the same amount of property in wild and unproductive lands.

The burdens of Government cannot fall equally upon all; the condition, estate and occupation of the individual must vary the operation of the law in almost every case.

[56]          * The idea of a revenue law which is equal in its

operation, is entirely Utopian, and never can be realized. If the Legislature should pass an Act designedly operating unequally; or if a want of uniformity in its operation was apparent upon its face, it would be the duty of this Court to interpose, and prevent the commission of so grave an injustice.

But if, in trying to approximate to a correct standard, the law may work a hardship in particular supposed cases, it would rather be a consideration for the Legislature, than an argument for the Courts.

In the exercise of a large discretion committed to them, they have adopted a scale of taxation, and whether it is designed to operate on inhabitants, or on the amount of business transacted, we are not prepared to say that it is incorrect.

But it is contended that the portion of the Act which refers to the sale of consigned goods, is in violation of the 8th section of the 1st Article of the Constitution of the United States, which provides that "Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes;" and the 10th section of 1st Article, "No State shall, without the consent of Congress, levy any impost or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

That part of the Act of May, 1853, supposed to be in violation of these sections, provides: 1st, That all goods, wares etc., brought into the State from any other State or foreign country, to be sold in this State, owned by any person not domiciled in the State, shall be declared consigned goods; and 2d, That every person selling such consigned goods, shall be taxed 60 cents on every $100 worth of goods so sold, such tax to be paid by the person selling such goods, he having a lien on the owner for the same.

Is this an interference with the powers of Congress to regulate commerce, or is it the imposition of an impost duty?

In support of this proposition, the case of *Brown* v. *The State of Maryland*, 12 Wheat. 419, has been relied on.

In that case, an Act of the Legislature of Maryland, requiring all importers of foreign goods, and others selling them by wholesale, bale or package, to take out a [57] license, or, in case of *refusal, subjecting them to forfeiture, etc., was held unconstitutional, under the provisions of the Constitution already quoted.

This decision has but little application to the present case, and its soundness has even been doubted; in fact, so much has it been refined and trenched upon by the subsequent decisions of the same Court, that it may be said to stand alone, as the decision of a particular case, and of no authority beyond it.

It will be observed, the law of Maryland imposed this tax upon the importers or wholesale dealers, and the decision of the Court did not attempt to follow the goods beyond the possession of the importer or the wholesale merchant.

The reason of this distinction is by no means clear, and cannot be justified on any sound principles. If the importer cannot be taxed in the way of license, because the goods are foreign fabrics or manufactures, it is hard to say why the retail dealer should be compelled to pay a license for selling the same articles.

. There is a marked difference between our statute and the Maryland Act, and the decision of *Brown* v. *The State of Maryland* is by no means conclusive on this case,

The Act of May, 1853, does not propose to tax the importer or wholesale dealer in foreign goods, before the same have been broken, but provides that the vendors of consigned goods, *i. e.*, goods belonging to persons not residing in the State, shall pay so much on every one hundred dollars' worth sold.

Slight as this distinction may *appear*, on examination it will prove a substantial one, when taken in connection with the powers of a sovereign State to tax persons and property within its own territorial jurisdiction.

The taxing power is an incident of sovereignty, the exercise of which belongs exclusively to every State, and attaches alike upon everything which comes within its jurisdiction.

The argument of the Court in the case of *Brown* v. *The*

*State of Maryland,* and of the counsel in this case, proceeds on the ground that a license to sell· is a tax on the article itself, and that such tax is prohibited by the Constitution.

If this argument be correct, it would work a total destruction of the independence of the State Governments, and leave * them powerless to regulate their own    [58] internal commerce, police, or to raise a revenue for State purposes.

Under such a construction, every species of property, except the real property and actual productions of the State, would be exempt from taxation, upon the ground that they were articles of commerce.

The absurdity of such a proposition is, however, attempted to be avoided by accepting foreign goods from the operation of the rule, only until such time as they have been broken in bulk, and become a part of the general property of the State.

In construing the powers of Congress upon this subject, it is to be observed, that the prohibition of the States from levying any import or export duties, does not flow from that provision of the Federal Constitution which gives to Congress the right to regulate commerce.

They are independent provisions, and by well settled rules of construction, the right of the States to regulate commerce is concurrent with that of Congress, with the understanding always, that all State regulations inconsistent with those of the Federal Government, on this subject, must give way; but this Act does not attempt or purport to extend beyond the internal commerce of the State, neither does it propose, in terms, the imposition of any impost duty.

It is no argument that the tax may operate upon the instruments or vehicles of commerce.

The case of *Nathan* v. *Louisiana,* 8 How. 73, contains a full exposition of the qualifications under which we are to understand this power to regulate commerce.

This was a revenue law of the State of Louisiana, enacting that every money or exchange broker should pay an annual tax to the State of two hundred and fifty dollars. An indictment was found under this law, and the defense

was, that the business taxed was exclusively that of buying and selling bills of exchange, or instruments of foreign commerce, or commerce between the States, and that the tax was repugnant to the grant of power to Congress on this subject. The Court held the law to be valid. Judge McLean, who delivered the opinion of the Court, said,

"The right of a State to tax its own citizens for the [59] prosecution of any particular business or pro-*fession within the State, has not been doubted. And we find that, in every State, money or exchange brokers, vendors of merchandise, of our own or foreign manufacture, retailers of ardent spirits, tavern keepers, auctioneers, those who practice the learned professions, and every description of property not exempted by law, are taxed. Money is admitted to be an instrument of commerce, and so is a bill of exchange, and upon this ground, it is insisted that a tax upon an exchange broker is a tax upon the instruments of commerce. What is there in the products of agriculture, of mechanical ingenuity, of manufactures, which may not become the means of commerce? And is the vendor of these products exempted from State taxation, because they may be thus used? Is a tax upon a ship as property, which is admitted to be an instrument of commerce, prohibited to the States? May it not tax the business of ship-building, the same as the exercise of any other mechanical art? And also the traffic of ship-chandlers and others who furnish the cargo of the ship, and the necessary supplies? There is but one answer to these questions. No one can claim an exemption from a general tax on his business, within the State, on the ground that the products sold may be used in commerce." Again he says: "The taxing power of a State is one of its attributes of sovereignty. And where there has been no compact with the Federal Government, or cession of jurisdiction for the purposes specified in the Constitution, this power reaches all the property and business within the States, which are not properly denominated the means of the General Government, and as laid down by this Court, it may be exercised at the discretion of the State. The only restraint is found in the responsibility of the members of

the Legislature to their constituents."  "If this power of taxation," he proceeds, "by a State within its jurisdiction, may be restricted beyond the limitations stated, on the ground that the tax may have some indirect bearing on foreign commerce, the resources of a State may be thereby essentially impaired.  But State power does not rest on a basis so undefinable.  Whatever exists within its territorial limits, in the form of property, real or personal, with the exceptions stated, is subject to its laws, and also the numberless enterprises in which its citizens may be engaged.  These are sub *jects of State regulation and [60] State taxation, and there is no federal power under the Constitution which can impair this exercise of State sovereignty."

This is the doctrine of the Supreme Court, given in the forcible and pointed language of a Judge "who, on the question relating to the extent of the power over commerce vested in the General Government has been uniformly in favor of its exclusive character.'

After thus reviewing the decision of Judge McLean, in 8 Howard, Judge Napton, in the case of *Crow* v. *The State of Missouri*, proceeds to say:  "It seems to be established beyond all dispute, by the present supreme judicial tribunal of the General Government, to which we look for authoritative expositions of the Constitution and laws of the Union, that the grant of power to Congress to regulate commerce with foreign nations and among the several States, is a mere affirmative grant of power, not exclusive in its character, nor affecting, in the slightest degree, the taxing power of the States—that the Federal Government has an ample protection to a full and efficient exercise of this power over commerce, in the supremacy of its laws, made in pursuance of the Constitution, over any conflicting State enactments, and in total prohibition to the States of all power to impose duties on imports or exports, or tonnage.  These safeguards are sufficient and ample to secure a just and fair execution of the powers rightfully claimed by the General Government, and to prevent all collision with the States.  To require more, and, by construction, to claim that the taxing

power of the States is only to be exercised on such conditions, and over such property as may not even incidentally or remotely affect foreign commerce, or commerce between the States, whether conflicting with any law of Congress or not, would be, in the judgment of the Federal Judiciary itself, destructive of all efficient State Government. Such a construction has been properly disclaimed by that high tribunal. Its assertion might justly subject them to the imputation of converting themselves into what an eminent statesman termed a truly formidable ' corps of sappers and miners,' engaged in loosening the foundations of State sovereignty."

[61]      * On an examination of the cases known as the License Cases, reported in 5th Howard, it will be observed that the whole doctrine of *Brown* v. *The State of Maryland* has been doubted, and that the right of the States to regulate their own internal commerce, and to tax every species of property within their own jurisdiction; nay, more, the concurrent power of the States over the subject of commerce, is now firmly established by the opinion of a majority of the Judges of the Supreme Court of the United States.

In reviewing these decisions, Judge Napton observes: "The case of *Brown* v. *Maryland* stands by itself—a decision rendered twenty-four years ago—nearly all its principles since doubted or overruled, and narrowed down, and frittered away, until its power for good or evil is gone. As a precedent, it will reach no case, except just such a one as itself was. It is possible, that if a State should now enact a law precisely in the language of the Maryland Act of 1821, such a law would yet be pronounced unconstitutional by the tribunal to which such questions belong; but I hesitate not to venture the opinion, that the doctrine will never be carried one jot or tittle further."

Again it is contended, that the Act of May, 1853, is in violation of that clause of the Federal Constitution which guarantees to citizens of one State the same privileges and immunities which they are entitled to in their own States.

It is said that portion of the Act which refers to con-

signed goods, proposes to tax the non-resident, and to exonerate the actual resident; and that the foreign owner of consigned goods may be compelled to pay a tax or license twice upon the same property.

This is a mistake, and, on a proper examination of the Act, it will be seen that no tax is levied on the foreign owner of consigned goods in the hands of the consignee, but only upon the sale, while all other consigned goods are taxed by the system of licenses, as part of the general property of the State.

We have carefully examined all the arguments of the respondents, and are irresistably impelled to the conclusion, that the * Act of May, 1853, is neither in   [62] derogation of the Constitution of this State, or the Constitution of the United States.

This opinion is based, as we believe, on no new principles, and in announcing it, we but reiterate the decisions of the tribunals of other States.

Without any precedents, however, to control us, looking alone to the powers of a sovereign State, and its absolute control over persons and property within its own jurisdiction, as well as to the ruinous consequences which would ensue from a different decision, we are fully of the opinion that the taxing power rests alone in the sound discretion of the Legislature, subject to the restrictions we have already laid down.

Without it, in cases of emergency or extraordinary necessity, State sovereignty and State power would be a baseless and visionary phantom, unable alike to maintain its own domestic independence and dignity, or to defend itself against the assaults of federal encroachment.

Judgment affirmed.

A petition for a rehearing was filed by respondents, but refused by the Court.