## WALLACK v. MAYOR OF NEW YORK.

*Amusements—power of legislature to regulate theaters, etc., by license — Constitutional law — laws 1872, chap. 836 valid — Society for reformation of juvenile delinquents — appropriation to not a gift to a private charity. Taxation — power of legislature as to.*

The power of regulating places of public amusement by license has from the earliest history of the State legislature been conferred upon the authorities of cities, villages, and towns, and laws of this character are sustainable as (1) a legitimate exercise of the taxing power of the State and (2) as a part of its police regulations.

By Laws 1872, chap. 836, it is provided (§ 1) that it shall be unlawful to exhibit in New York City, a theatrical entertainment without a license (§ 2), which the mayor may grant on the payment of $500, and a penalty of $100 is imposed for exhibiting without license, which the society for the reformation of juvenile delinquents is authorized to sue for and collect in the name of the people (§ 3), that the license may for cause be revoked by a judge of any court of record, etc., that (§ 4), the mayor shall pay the moneys received for

Wallack v. Mayor of New York.

licenses to the treasurer of said society for the use of the society. It is also provided (§ 6), that a violation of the provisions of the act shall be a misdemeanor, (§ 7), that the police shall enforce it, and (§ 8), that the society named may procure an injunction to restrain any one threatening to exhibit without license. Said society is a corporation instituted for the purpose of taking charge of, managing and educating such delinquent and vagrant children as the courts may commit to it, and it is required by law to receive and care for such persons. *Held* (1), That the legislature had power to confer upon the mayor the authority to regulate places of amusement by license (2), that the disposition required to be made of moneys received, did not affect the validity of the provision requiring a license to be obtained (3), nor did the authority to the society named to prosecute for the penalty or the disposition of the penalty.

*Held*, also that such society even if a private corporation, was such only for public uses, and that the appropriation of the license fees to it was not a gift to a private charity, but a provision for public uses lawfully administered through that corporation, and within the constitutional power of the legislature. The amendments to the constitution taking effect January 1, 1875, do not restrict this power.

*Held*, further that even if the society was a mere private corporation, and the appropriation a mere gift for private use in view of the objects of the society, it is clearly sustainable; (following, *Fire Department of N. Y.* v. *Noble*, 3 E. D. Smith, 440;) *People* v. *Batchellor*, 53 N Y. 128, distinguished.

The power of the legislature in the absence of constitutional restriction over the subject of taxation is supreme, and it is exclusively within legislative discretion to determine the subject and class to be taxed, the district within which it is to be collected, and the manner of its collection, and the purpose to which it shall be applied, and the constitutional inhibition against taking private property for public use, etc., and depriving of property without due process, etc., are not limitations on the taxing power.

APPEAL by defendants from an order at the special term continuing an injunction.

The action was brought by John Lester Wallack against the Mayor, Aldermen and Commonalty of the City of New York, and the Society for the Reformation of Juvenile Delinquents in the City of New York, to restrain defendants from carrying out the provisions of chapter 836 of the Laws of 1872. The plaintiff was proprietor of a theatre in New York city know as Wallack's theater. All other material facts appear in the opinion.

*Edmund Randolph Robinson*, for appellants.

*A. Oakey Hall*, for respondent.

DAVIS, P. J. The appeal in this case is from an order of the special term, continuing *pendente lite* an injunction restraining the defendants and each of them from "beginning or prosecuting or instituting against the plaintiff in the above-entitled action, any of the proceedings which are provided by any of the sections of chapter 836 of the Laws of 1872 of this State, referred to in the complaint in this action, and from enforcing or imposing, or attempting to enforce or impose, any penalty or penalties against the said plaintiff, under or by color of any of the provisions of said chapter, by suit or otherwise, and from applying for any injunction to restrain the said plaintiff from conducting or carrying on the business and place of amusement for the performances in the complaint mentioned."

The act referred to is the act entitled, "An Act to regulate places of amusement in the city of New York." The first section of the act declares that it shall not be lawful to exhibit to the public in the city of New York the various entertainments and performances therein mentioned, without first having obtained "a license for the place of such exhibition," as thereinafter provided.

The second section empowers the mayor to grant such license, on receiving for each license so granted, before the issuing thereof, the sum of $500, and imposes a penalty of $100 for every exhibition or performance without such license, and authorizes the Society for the Reformation of Juvenile Delinquents to prosecute for such penalty in the name of the people of the State of New York.

The third section subjects the licenses granted by the mayor to be revoked upon a hearing before a judge or justice of any court of record of the city, on summary proceedings.

The fourth section provides that "upon granting every such license authorized by this act the said mayor shall receive from the person to whom the same shall be granted the amount payable for said license as above provided, which amounts, as respectively received by him, shall be paid over to the treasurer of the said Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of said society."

The sixth section declares the violation of any of the provisions of the act to be a misdemeanor punishable, on conviction, by fine or imprisonment or by both.

The seventh section declares it to be the duty of the police and other officers to arrest and convey persons violating the provisions

of the act before any magistrate having jurisdiction of the offense, "to be dealt with according to law."

And the eighth section provides that it shall be lawful for the Society for the Reformation of Juvenile Delinquents in said city to apply to the Supreme Court for an injunction to restrain any person from opening any theater, circus or building which he shall open or advertise to open until he shall have complied with the regulations of the act in obtaining such license, which injunction may be allowed, upon a complaint, to be in the name of said society.

The chief object of this act is to provide for the regulation of places of amusement in the city of New York by placing them under the control of the public authorities, through a system of licenses to be granted by the mayor, on the payment of a fixed fee, subject to revocation in summary proceedings before a judge or justice of a court of record and sanctioned and enforced by pains and penalties, both civil and criminal, and by the restraints of an injunction to prevent the opening of such places without license.

There is nothing new in the system of regulating such places by license. In all its essential features it has been applied by special statutes to the city of New York for upward of forty-five years (Laws of 1829, chap. 302, § 4; Laws of 1839, chap. 13; Laws of 1862, chap. 281). And the same or similar authority has been conferred upon the municipal authorities of the incorporated cities and villages of the State by their respective charters, and upon the authorities of the several towns of the State by general laws reaching back to the earliest history of its legislation. Laws of this character are sustainable upon two grounds. First, as a legitimate exercise of the taxing power of the State. *Providence Bank* v. *Billings,* 4 Pet. 514; *Nathan* v. *Louisiana,* 8 How. U. S. 73; *License Tax Cases,* 5 Wall. 462, 475; *Savings Bank Cases,* 6 id. 611; *Lunt's Case,* 6 Greenleaf, 412; *Ingersoll* v. *Skinner,* 1 Den. 540; *People* v. *Coleman,* 4 Cal. 46; *Raguet* v. *Wade,* 4 Ohio, 107; *State* v. *Stephens,* 4 Texas, 137; *Germania* v. *State,* 7 Md. 1 ; *State* v. *Bock,* 9 Texas, 369 ; *Boston* v. *Shaffer,* 9 Pick. 415; *City of New Orleans* v. *North,* 12 La. An. 205; *Fire Department of N. Y.* v. *Noble,* 3 E. D. Smith, 452; *People* v. *Lawrence,* 41 N. Y. 137.

Second, as a part of the police regulations of the State. *Fire Department* v. *Noble,* 3 E. D. Smith, 452; *Metro. Board of Excise* v. *Barrie,* 34 N. Y. 657; *License Cases,* 5 How. U. S. 589; *Cooley* v. *Board of Wardens,* 12 id. 299 ; *State* v. *Allmond,* 2 Houst. 612;

*Commonwealth* v. *Stodder*, 2 Cush. 562; *Nightingale's Case*, 11 Pick. 168; *Village of Buffalo* v. *Webster*, 10 Wend. 100; *Bush* v. *Seabury*, 8 Johns. 418; *Slaughter House Cases*, 16 Wall. 62; *Commonwealth* v. *Colton*, 8 Gray, 488; *Tanner* v. *Village of Albin*, 5 Hill, 121.

It will be difficult to find any authority in which the power of such regulation and restraint by license has been denied to the State or Federal legislature on constitutional grounds when exercised within their appropriate jurisdictions.

In our judgment the constitutionality of the act of 1872 does not at all depend upon the validity of the disposition of the fees to be received by the mayor. That is a question which legitimately arises after the license fee shall have been paid to him by the person taking out the license, and in which such person has no greater interest than any other citizen who is a member of the municipal corporation. It is a question properly between the city and the Society for the Reformation of Juvenile Delinquents, and if it be true that the legislature has not power to provide that the mayor shall pay over such fee to the treasurer of that society pursuant to the directions of the act of 1872, the consequence is that it is his duty to refrain from doing so, and to pay them into the city treasury. In either case the obligation to take the license before opening the theater or other exhibition, and to pay to the mayor the prescribed fee, remains in perfect vigor.

Nor is this affected by the fact that authority is given to the society, etc., to commence an action in its own name to restrain the opening of exhibitions without license. That is a power which may be conferred by the legislature on any citizen or person as a means of more stringently enforcing its laws of prohibition. And the same thing is true of the provision which authorizes the society to institute suits at law *in the name of the people of the State* to recover penalties for violation of the law. Authority of that kind can be legitimately conferred on any person, on such terms as the legislature choose to dictate; and the disposition of the penalties recovered is clearly within the sound discretion of the legislature. Frequent examples of such legislation may be found in the statutes. Whether they are discreet or provident or not is for the legislature alone to judge ; but no one has in any case that has fallen under our notice questioned their constitutionality.

These remarks it is to be observed are limited to those sections

of the act which are aimed at the offense of violating its provisions, and which become operative only upon such violation or threatened violation.

We are of opinion therefore that the provisions of the act of 1872, requiring licenses to be taken out and fees to be paid to the mayor, and providing pains and penalties, civil and criminal for violations of the obligation to take out licenses are valid and constitutional. And that it was error in the court below to hold them to be otherwise, because of the supposed invalidity of the directions of the act touching the disposition of the license fees; and we do not think that such disposition is so mingled with the scheme of the act that both must stand or fall together. This we think is illustrated by the point made by the learned counsel for the respondent as to the effect of the charter of 1873. He insists that a provision of that charter requires the license fees when paid to the mayor under this act, to be paid into the treasury for the use of the city. If that be in the act of 1872, that act is so modified thereby that the question of the illegality of the direction to pay the license fees to the treasurer of the society for the reformation of juvenile delinquents is out of the case; and nothing is left but a system of licenses and fees exclusively for the public benefit sanctioned by provisions for civil and criminal remedies for violations of the act to be enforced by the police and by designated persons. Such a system we think is clearly valid. By taking the prescribed license, every person otherwise obnoxious to the penalties can shield himself against them, but he has no right by attacking the penalties in an action to restrain their enforcement to shield himself against the obligation to take the license.

But the more interesting question of this case is as to the validity of the provision requiring the mayor to pay over the license fees to the treasurer of the society. It is claimed that this is the imposition of a tax for the benefit of a private corporation; or as succinctly stated by the learned justice at special term, "an act to compel certain classes to support a private society that may if it see fit do the work of the State."

The true question, however, is, as it seems to us, whether the legislature has power to appropriate and donate to the society in question the fees or taxes derived from licenses, which it sees fit to impose for the purpose of regulating and restricting places of public amusement of the kind named in the act. The exercise of

this power by the legislature is certainly not startling for its novelty. Substantially the same provisions of appropriation to this society are found in chapter 302 of the Laws of 1829; they are repeated in chapter 13 of the Laws of 1839, and renewed in the act of 1872, now under consideration. So that more than forty-five years have elapsed since such license fees have been one of the sources of revenue to the society, without any question being raised in the courts as to the constitutionality of the several acts. This fact is not a refutation of the position of the plaintiff's counsel, for no age can ripen into constitutional law a violation of the constitution; but it is an argument that should induce courts to be sure of standing on very solid ground before overturning enactments sanctioned by such long continued and unquestioned exercise.

The force of the objection seems to depend upon the character of the donee. If the act directed the license fees to be paid into the State treasury or the treasury of the city, or to be applied to maintain the police, or to maintain prisons under the control of public officers, it seems to be conceded that the disposition of the fund would by no reflective influence taint the act with the odor of unconstitutionality. In view of this argument, it may be important to inquire what is the true character of the Society for the Reformation of Juvenile Delinquents in the city of New York.

That society was incorporated by an act passed March 29, 1824 (Laws 1824, chap. 126). It was clothed with the ordinary powers of a corporation, such as perpetual succession, the capacity of suing and being sued, of having a common seal, and of purchasing, holding and conveying estate, real or personal, for the use of the corporation, provided that its real estate should never exceed the yearly value of $10,000, nor be applied to any other purposes than those for which the incorporation was formed. Its estate and concerns were to be conducted by a board of thirty managers, to be elected yearly "by the subscribers to the association," and it was declared that no manager should receive any compensation for his services. Power was given to the managers at their discretion to receive and take into the house of refuge to be established by them "all such children who shall be taken up and committed as vagrants or convicted of criminal offenses in the said city, as may in the judgment of the court of general sessions of the peace, or of the court of Oyer and Terminer in and for the said city, or by the jury before whom any such offender shall be tried, or of the

police magistrates, or of the commissioners of the alms-house and bridewell of the said city, be proper objects;" and to place such children during their minority at employments, and cause them to be instructed in such branches of useful knowledge as might be suitable to their years and capacity, with power also to apprentice them to proper trades, in accordance with the provisions of the law on that subject; and to make by-laws for the regulation and management of the estate and concerns of the corporation, and for the management, instruction, discipline and disposition of such children while in the house of refuge or under their care, not contrary to law; and to appoint officers, agents and servants to transact the business of the corporation, and designate their duties.

The managers were required to make annual reports to the legislature and the corporation of the city of New York of the number of children received, the disposition made of them, their receipts and expenditures, and generally of all their acts and proceedings. The act was required to be construed benignly and favorably in all courts and places, and was subjected at any time to be altered, modified or replealed by the legislature.

By chap. 24 of the laws of 1826, the act was amended so as to provide that the managers "shall receive and take into the house of refuge, established by them in the city of New York, all such children as shall be convicted of criminal offenses in any city or county of this State, and as may, in the judgment of the court before whom any such offender shall be tried, be deemed proper objects," and the same powers and duties were conferred and required as in respect of the children embraced in the original act, and the sheriffs of the several counties were allowed compensation for transportation of juvenile delinquents, the same as for transporting convicts to the State prison, to be paid by the supervisors of the several counties.

By the act of April 29, 1829 (Laws 1829, chap. 302), a fund was created, payable by the commissioners of health out of moneys received for the use of the Marine Hospital to the treasurer of the society in aid of its purposes.

By the act of April 16, 1830 (Laws 1830, chap. 181), the governor of the State was empowered to direct the agent of either of the State prisons to convey convicts under seventeen years of age to the house of refuge, there to be confined according to the rules and regulations of said house of refuge.

By chap. 186 of the Laws of 1831 an additional fund was directed to be paid to the society by the treasurer of the city of New York, out of the fund for the support and maintenance of the poor, derived from a duty on the sale of liquors and the licensing of inns and taverns, and by chap. 13 of the Laws of 1839, the proceeds of licenses of theatrical and equestrian performances were directed to be paid over in support of the society.

By chap. 100 of the Laws of 1840, chap. 460 of the Laws of 1847 and chap. 608 of the Laws of 1853, the society is required to receive and safely keep criminals under the age of sixteen years convicted in this State of offenses against the laws of the United States.

The buildings of the society were erected at public expense on public property as provided by chap. 254 of the Laws of 1851 and chap. 539 of the Laws of 1855 ; and by chap. 252 of the Laws of 1847 and chap. 386 of the Laws of 1851, the school of the society is entitled to participate in the apportionment of the public school moneys and is subjected to the general supervision of the board of education of the city of New York.

Under the act of May 8, 1846 (Laws 1846, chap. 143), authorizing the establishment of a house of refuge for juvenile delinquents in Western New York and various acts afterward passed, the territory from which juvenile convicts are to be sent by the courts to the house of refuge of the society in New York has been diminished and other laws establishing houses of refuge on similar foundations in the city of New York and in the city of Buffalo have clothed them with power to receive and take care of a portion of the delinquents which, under the laws above cited, would have been consigned to the care of the society in New York. But all these enactments have left intact the general powers and duties of the corporation under consideration. For nearly half a century from time to time the legislature has made direct appropriations for the maintenance of the house of refuge of the society, and it has been at all times subject to the visitation of that body.

This review of the legislation creating the Society for the Reformation of Juvenile Delinquents in the city of New York, and of the subsequent legislation touching its duties and powers, shows clearly the true character of the institution. It is in no sense a trading corporation. It has neither capital, nor stock, nor stockholders, and it is incapable of making either profits or dividends, or carrying on trade or manufactures for the private emolument of its sub-

scribers or managers, or of any person. Its purposes and objects are exclusively public, and if in any sense it may justly be called a private corporation, it is certainly such only for public uses. Its connection with the administration of criminal justice in the State is just as clear and well defined as is that of any of the public prisons managed by commissions or by public officers — the only difference being that in respect of the class of offenders who may be committed to its care, the legislature has seen fit to create a body corporate with all the official functions necessary to their restraint, discipline, punishment and reformation which could be used by the manager of jails and prisons if the offenders had been committed to their custody, to which have been superadded in tenderness to the youth of such offenders means supposed to be adequate to rescue them from the path of crime and restore them to a life of usefulness and virtue.

We know of nothing in the constitution of 1821, under which the society was incorporated, to prevent the legislature from creating a body corporate for such purposes, nor do we see why such a corporation should not be deemed in considering the question now before us, as much a body politic as a municipal corporation clothed with the same functions, or a board of commissioners whose authority and powers are the same. But this is an immaterial question so long as the uses of the institution are altogether public and in no sense private. It is the *uses* that must control, and not the character of the person or body who exercises them, when the question of the right of the legislature to appropriate public moneys is challenged on such a ground as that under consideration. We think it is perfectly manifest that the license fees appropriated by the act of 1872, are given exclusively to uses which in every sense are as public as those of any other branch of the administration of criminal justice.

It is by no means necessary to establish for the purposes of this case, that the legislature has power to make donations to public or private charities ; but only to maintain that it may provide for the administration of criminal justice toward youthful offenders, for whom reformation is more desirable than severe punishment, in a manner different from that to which old and hardened criminals are subjected ; and for that purpose may create instrumentalities which to it seem best adapted to accomplish the end.

Whether such instrumentalities be public officers, or boards of

commissioners, or a municipal, or other body corporate, they are engaged when lawfully set in operation, in the administration of a portion of the public functions and uses for which the government itself is created, and they ought not be let down to the rank of trading corporations organized for traffic and individual gain, for the purpose of upholding fine spun theories of constitutional law. The idea that the appropriations made by the legislature to such bodies are charities to private corporations for personal uses, has no basis in fact, and can have none in law, when it is considered that the uses to which the appropriation can lawfully be applied, are those for which the government itself is created and bound in some form to discharge.

Our conclusion is, therefore, that the appropriation of the license fees, by the act of 1872, to the Society for the Reformation of Juvenile Delinquents, is not a gift to private charity, but a provision for public uses lawfully administered through that corporation, and is clearly within the constitutional power of the legislature.

It is a pertinent and illustrative fact that in the radical restrictions to be imposed on the legislature by the amendments to the constitution adopted at the late election, and to take effect on the 1st of January next, the power we have been considering is expressly retained. Section 10, of such amendments is in these words. " Neither the credit, nor the money of the State shall be given or loaned to or in aid of any association, corporation, or private undertaking. This section shall not however prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and *juvenile delinquents as to it may seem proper.*"

But if the society for the reformation of juvenile delinquents is to be regarded as a mere private corporation, and the appropriation of the act of 1872, as a mere gift to such a corporation for private use, yet in view of the objects of the society it is clearly sustainable by numerous authorities.

The cases familiarly known as the " *Fire Department cases* " reported in 3 E. D. Smith, 440, 453 (*Fire Department of N. Y. v. Noble*), seem to us controlling upon this question. In those cases the question was as to the constitutional validity of acts of the legislature which required the agent of every foreign insurance company, or underwriter to pay to the treasurer of the fire department two per cent of all premiums for insurance made, or agreed to be

made in the city of New York, and to execute a bond to such treasurer that he would make such payment. A penalty of $1,000 was imposed for each insurance made before executing such bond, to be recovered by the fire department, and other heavy penalties were imposed for violations of the act which were to be recovered in the name of the people of the State for the use of the fire department.

The fire department was a corporation created by the Laws of 1798. Its origin and history are fully traced in the opinion of the court in *People* v. *Pinckney*, 32 N. Y. 377, 388. Its objects and purposes as defined in its charter are "for the relief of such indigent and disabled firemen and their families as may be interested therein, and who may in the opinion of a majority of the trustees be worthy of assistance;" Davies Laws of New York City, 392. The cases were elaborately and ably argued, and the questions raised seem to have been identical with those urged upon us. The validity of the acts was sustained first at special term by WOODRUFF, J., and again at general term by INGRAHAM, DALY and BRADY, JJ., and their decision was finally unanimously affirmed by the Court of Appeals as stated in note to the report in 3 E. D. Smith, 440.

If we doubted the correctness of this decision we should not deem ourselves at liberty to disregard it. It is on nearly every point presented on all fours with the case before us.

But it is urged that the authority of those cases is shaken by the late case of *People* v. *Batchellor*, 53 N. Y. 128. The question in that case was whether a mandatory statute compelling a municipal corporation, without its own consent, to issue its bonds and exchange them for the stock of a railroad company, was valid. It was held that the municipal corporation could not be compelled to become a stockholder in the railroad company against its own will and consent. We are not able to see that the questions in this case or in the *Fire Department cases* were involved in or affected by *People* v. *Batchellor*. The cases on this subject are so numerous that the bare citation of a part of them is all that can be justified in this place. They establish that the power of the legislature, in the absence of constitutional restriction, over the subject of taxation is supreme. That the whole subject is exclusively within legislative discretion, and that the legislature is to determine the subject and the class to be taxed, the district within which the tax is

to be laid, the manner of its collection and the purpose to which, when collected, it shall be applied. 1 Kent's Com., 441 ; *Thomas* v. *Leland,* 24 Wend. 65 ; *People* v. *Mayor of Brooklyn,* 4 N. Y. 420; *Fire Department cases,* 3 E. D. Smith, 440 ; *Guilford* v. *Supervisors,* 13 N. Y. 143 ; *Brewster* v. *Syracuse,* 19 id. 116 ; *Matter of Trustees N. Y. P. E. P. School,* 31 id. 582 ; *Darlington* v. *Mayor of N. Y.,* 31 id. 190 ; *Howell* v. *Buffalo,* 37 id. 267 ; *Litchfield* v. *Vernon,* 41 id. 123 ; *People* v. *Lawrence,* 41 id. 137 ; *People ex rel. Harlem R. R. Co.* v. *Havemeyer,* 3 N. Y. Sup. 365; *People* v. *Flagg,* 46 id. 404.

And they establish also that the constitutional inhibitions against the taking of private property for public use without just compensation and against the deprivation of life, liberty or property without due process of law, are not limitations upon the taxing power. The absence of restrictions in this State has led to the adoption of the amendments to the Constitution already referred to in order to guard against abuses of this absolute legislative discretion. They will operate, it is to be hoped, with signal benefit to the people ; but however desirable such restrictions might be, it was never in the power of the courts to impose them even in cases where the abuse of the discretion was revoltingly apparent.

We may enjoy, but we cannot otherwise use the admirable argument of the learned counsel for the respondent in defense of theatrical exhibitions, such as those conducted by his client. It is not our duty to defend the justice or wisdom of the law which he seeks to condemn. It is enough for us that the legislature has power to enact it, and in its discretion has seen fit to do so. In such case, our duty to uphold and enforce it is very simple and plain. Yet, it might be no difficult task to show that the system of licenses and its consequent preclusion of unworthy exhibitions, from which license is withheld, is greatly advantageous to such establishments as the plaintiff's, by preventing the degradation of all such performances in the public estimation, which would be quite certain to grow out of the promiscuous and unrestrained exhibitions which would spring up in the absence of legal restrictions.

The order of the court below must be reversed and the injunction dissolved with $10 costs of the appeal, besides disbursements, and $10 costs of the motion in the court below.

*Ordered accordingly.*