41 147
92 310

41 147
130 634

41 147
j144 271

## APRIL TERM, 1871.

[No. 2,492.]

## THE STOCKTON AND VISALIA RAILROAD COMPANY *v.* THE COMMON COUNCIL OF THE CITY OF STOCKTON.

STATUTORY CONSTRUCTION—POLICY OF LAW NOT TO BE CONSIDERED.—In the consideration of a statute, duly passed by the Legislature, the Supreme Court will not inquire into the motives of its authors, or entertain the question whether it be a wise or a foolish law.

POWER OF JUDICIARY TO DECLARE STATUTE UNCONSTITUTIONAL.—The power of the judiciary to declare a statute unconstitutional should never be exerted, except where the conflict between it and the Constitution is palpable, and incapable of reconciliation.

CONSTITUTIONAL POWER OF TAXATION—LEGISLATIVE DISCRETION.—The principle upon which taxation is to be imposed by the State Government is pointed out by the Constitution; but the extent to which it may be carried is left unlimited, except by legislative discretion.

"PUBLIC USE" A MATTER OF LEGISLATIVE DETERMINATION.—The "public use," mentioned in the Constitution (Art. X, Sec. 8), upon which the power of eminent domain is to be exerted, is left in large measure to legislative determination; and the legislative resolve, by which a tax is imposed or

---

private property taken, is such a legislative determination that the public use is to be promoted by the tax or the taking directed.

Napa Valley Railroad Co. *v.* Napa County, 30 Cal. 437, on the point that railroads concern the public interest as a matter of legal judgment, and that legislative action to that effect is not open to review by the judicial department, cited as controlling authority.

"Public Use" to Support Taxation for Railroad Purposes.—The same kind of "public use" which will authorize the taking of private property in aid of a particular railroad, in the exercise of the power of eminent domain, will support the laying of a tax in aid of the same road, under the taxing power.

Railroads may be of "Public Use," though also for Private Profit.—The mere fact that a railroad is owned and operated by a private corporation, and for private profit, does not prevent it from being also of "public use."

Means of Aid to Railroads.—Aid, as fostering a public use, may be extended to the construction of a railroad, by means of the power of eminent domain, or of subscription to capital stock, and by donation made by cities and other political subdivisions of the State, under the authority of the Legislature.

Stockton City Railroad—Subsidy Act Constitutional—Mandamus.— The Act of April 1, 1870, empowering the City of Stockton to aid in the construction of the Stockton and Visalia Railroad (Stats. 1869-70, p. 551), declared constitutional; and the Common Council of Stockton required by mandamus to levy a tax to pay interest accruing under its provisions.

This was an original application in the Supreme Court for a writ of mandate to require the Common Council of the City of Stockton to levy a tax sufficient to raise the sum of twenty-one thousand dollars, in gold coin, being the interest for the first year (1870) on the bonds issued under and by virtue of "An Act to empower the City of Stockton to aid in the construction of the Stockton and Visalia Railroad," approved April 1, 1870 (Stats. 1869–70, p. 551). The petition set forth the facts, and, among other things, that the defendant, in response to a written demand made upon it by the petitioner, refused to levy such tax "then, or at any other time," assigning as a reason that the statute was unconstitutional and void. The same ground substantially was taken by the answer in this proceeding.

*J. R. McConnell,* and *J. B. Hall,* for Petitioner.

The Act in question is constitutional and valid, as a law emanating from the supreme legislative power. In the absence of constitutional restrictions, the legislative authority is, to all intents, supreme, and, humanly speaking, omnipotent. (See 1 Black. 160; Smith's Stat. and Const. Construction, 243–258; Sedgwick's Stat. Const. 243, 475; 1 Kent, 448; Cooley on Limitations, 83–92; *Commonwealth* v. *McCloskey,* 2 Rawle, 374; *Beebe* v. *The State,* 6 Ind. 528; *Johnson* v. *The Commonwealth,* 1 Bibb, 602; *People* v. *Draper,* 15 N. Y. 543; *Fletcher* v. *Peck,* 6 Cranch, 136; *Winehamer* v. *The People,* 13 N. Y. 391; Cooley on Limitations, 87, 168, notes; *Sharpless* v. *The Mayor of Philadelphia,* 21 Pa. St. 162.)

The taxing power is left by the Constitution unlimited, both as to its objects and to the amount imposed. (Cooley on Limitations, 479; *McCullough* v. *Maryland,* 4 Wheaton, 428; *Providence Bank* v. *Billings,* 4 Peters, 661; *Booth* v. *The Town of Woodbury,* 32 Conn. 124; *Broadhead* v. *Milwaukee,* 19 Wis. 624; *Dinehart* v. *Town of Lafayette,* 19 Wis. 677.) In California the only limitation upon the taxing power is the constitutional provision requiring " taxation to be equal and uniform." Subject to this restriction, the authority to impose taxes is with us as unlimited as in any other sovereign community on the globe. (*Nougues* v. *Douglass,* 7 Cal. 85; *McCauley* v. *Brooks,* 16 Cal. 11; *People* v. *Seymour,* 18 Cal. 332; *Taylor* v. *Palmer,* 31 Cal. 251.)

The statute in question provides for a case of taxation— not of eminent domain. The City of Stockton is a municipal body, fully competent to tax its citizens within legitimate bounds; and the Act does not empower or attempt to empower it to exceed those bounds; nor does it conflict with any clause of the Constitution relating to taxation. (*Town of Guilford* v. *Supervisors,* 18 Barb. 616; *People* v. *Coleman,*

4 Cal. 46; *High* v. *Shoemaker*, 22 Cal. 363; *Blanding* v. *Burr*, 13 Cal. 343; *Burnett* v. *Mayor of Sacramento*, 12 Cal. 72; *Taylor* v. *Palmer*, 31 Cal. 251; *People* v. *McCreery*, 34 Cal. 432; *Beals* v. *Amador County*, 35 Cal. 630; *People* v. *Alameda County*, 26 Cal. 647; *Napa Valley R. R. Co.* v. *Napa County*, 30 Cal. 435; *People* v. *Mayor of Brooklyn*, 4 Const. 420; *Prettyman* v. *Sup. of Tazwell Co.*, 19 Ill. 411; *Bank of Rome* v. *Village of Rome*, 18 N. Y. 38.)

We admit that the Legislature cannot take one man's property from him and give it to another, for this would be to deprive him of his property without due process of law. Nor can the Legislature, under pretense of taxation, do what it cannot do directly. A tax, therefore, imposed purely and singly for the purpose of paying money to a man for his *sole* benefit, would come within the category of void legislation. But such is not the case with railroads, and particularly with the railroad intended by this Act. It is of such a public character as to justify taxation in its behalf. The mere fact of its ownership being in individuals does not prevent its use from being public and even wholly public. There is abundant and conclusive authority to show that railroads in general are now regarded as of public concern. (Constitution, Art. IV, Sec. 37; Hittell's Gen. Laws, 826; Thompson on Highways; *Rex* v. *The Severn and Wye R. R. Co.*, 2 Barn. & Ald. 647; *People* v. *Kerr*, 27 N. Y. 189; *Contra Costa R. R. Co.* v. *Moss*, 23 Cal. 324; Vattell, Lib. 1, Chap. 9, Secs. 100–103; *Bloodgood* v. *Mohawk and Hudson River R. R. Co.*, 18 Wend. 10; *Beekman* v. *Saratoga and Schenectady R. R. Co.*, 3 Paige, 45; *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 149; *Moers* v. *City of Reading*, 21 Pa. St. 189; *Commonwealth* v. *McWilliams*, 11 Pa. St. 61; *Shaw* v. *Dennis*, 5 Gilman, 405; *Gibbons* v. *Mobile and G. R. R. Co.*, 36 Ala. 412; *Stein* v. *City of Mobile*, 24 Ala. 612; *Bank of Augusta* v. *Augusta*, 49 Maine, 508; *Goddin* v. *Crump*, 8 Leigh, 120; *City of Bridgeport* v. *Housatonic R. R. Co.*, 15 Com. 475; *Nichol*

v. *Mayor of Nashville*, 9 Humphreys, 252; *Clark* v. *Town of Janesville*, 10 Wis. 170; *Bushnell* v. *Beloit*, 10 Wis. 195; *Cin. R. R. Co.* v. *Clinton County*, 1 Ohio, 77; *Cass* v. *Dillon*, 2 Ohio, 607; *Fosdick* v. *Perrysburg*, 14 Ohio, 472; *V. S. and Texas Railway* v. *Parish of Ouachita*, 11 La. An. 649; *Parker* v. *Scoggin*, 11 La. An. 629; *N. O. O. & G. W. R. R.* v. *Estate of McDonough*, 8 La. An. 341; 21 Miss. 209; *Talbot* v. *Dent*, 9 B. Monroe, 526; *Slack* v. *Maysville R. R. Co.*, 13 id. 1; *Copes* v. *City of Charleston*, 10 Richardson, 491; *Clark* v. *Rochester*, 24 Barb. 446; *Dubuque County* v. *D. & P. R. R. Co.*, 4 Green, 1; *State* v. *Bissell*, 4 Green, 328; *Clapp* v. *Cedar County*, 5 Iowa, 15; *Ring* v. *Johnson County*, 6 Iowa, 265; *McMiller* v. *Boyles*, 6 Iowa, 304; *Games* v. *Robb*, 8 Iowa, 193; *State* v. *Board of Equalization of Johnson County*, 10 Iowa, 157; *City of St. Louis* v. *Alexander*, 23 Mo. 483; 2 Jones' Eq. 141; *City of Aurora* v. *West*, 9 Ind. 74; Redfield on Railways, Sec. 230, Note 1; *County of Knox* v. *Aspinwall*, 21 How. 539; *Same* v. *Wallace*, 21 How. 547; *Zabriskie* v. *Cleveland R. R. Co.*, 23 How. 381; *Amoy* v. *Mayor of Alleghany*, 24 How. 305; *Commonwealth* v. *Aspinwall*, 24 How. 376; *Gelpecke* v. *Dubuque*, 1 Wallace, 176; *Low* v. *Marysville*, 5 Cal. 214; *Patterson* v. *Marysville*, 13 Cal. 182; *Hobart* v. *Supervisors of Butte*, 17 Cal. 29; *French* v. *Teschemaker*, 24 Cal. 641; *People* v. *Coon*, 25 Cal. 641; *People* v. *Supervisors of San Francisco*, 27 Cal. 667; *Robinson* v. *Bidwell*, 22 Cal. 394; *Napa Valley R. R. Co.* v. *Napa County*, 30 Cal. 435; *Contra Costa R. R. Co.* v. *Moss*, 23 Cal. 324; *People* v. *Pacheco*, 27 Cal. 209; Redfield on Railroads, Sec. 230, Note 1; Pierce on Am. Railroad Law, 108–115, notes.) Indeed, it is not saying too much to assert that no question has been mooted in the Courts of these States, upon which a doubt at all could hinge, in the determination of which there has been so remarkable a concurrence of opinion.

There are several cases, such as *State* v. *County of Wapello*, 13 Iowa, 390; *Whiting* v. *Sheboygan Railway Co.*, in Wiscon-

sin; and *People* v. *Township of Salem*, in Michigan, which hold a contrary doctrine, proceeding upon the idea that because a railroad is owned by what they term a private corporation, its use is therefore private; but we may, with perfect safety to our argument, leave these cases to the rebuke of the U. S. Supreme Court, in *Gelpecke* v. *Dubuque*, 1 Wallace, 206, that they stand in unenviable solitude and notoriety.

It may, however, be objected that in this case the city does not become a stockholder in the company, nor acquire an interest in the road in exchange for her bonds; that, therefore, such bonds are what they may choose to call a pure "donation," and that the act in question, not being founded upon a proper consideration, is null and void. But assuredly, if the Legislature can authorize a city to take stock in a railroad company, and levy a tax to pay the principal and interest of the bonds issued in exchange for such stock, it may, by a like exercise of power, authorize it to advance its bonds by way of direct aid to the road, without receiving stock therefor. The existence of the taxing power being conceded, the Legislature is the sole judge of the occasion of its exercise. All the authorities admit this, including Judge Cooley and the Iowa and Wisconsin Courts. In fact, many of the decisions cited by us are cases of the absolute advance of the bonds, or other securities—no stock being received in exchange. (See *Bank of Augusta* v. *City of Augusta*, 49 Maine, 508; *Stein* v. *City of Mobile*, 24 Alabama, 612; *People* v. *Supervisors of S. F.*, 27 Cal. 667; *Contra Costa R. R. Company* v. *Moss*, 23 Cal. 324; *Napa Valley R. R. Co.* v. *Napa County*, 30 Cal. 435; and especially *People* v. *Alameda County*, 26 Cal. 647; and *Beals* v. *Amador County*, 35 Cal. 630, in respect to the finality of the legislative judgment relative to the occasion for exercising the taxing power.)

*Jo Hamilton, Attorney General,* for Respondents.

The issue in this case is whether a municipal corporation can be compelled to levy a tax upon its citizens and property to raise a subsidy to a private corporation. As an original proposition, I have no doubt that the true principle is with respondents.  It is true that years ago, during the internal improvement mania which existed all over the country, the early decisions of many of the States upon this power of taxation went too far; but even those decisions, I think, will be found not to have gone to the extent asked for in this case.  In most, if not all of them, the discussions grew out of cases in which the corporations were stockholders, and not like the present case, where the municipal corporation is asked to pay without being interested in the enterprise, except by that incidental interest which would be expected to inure from increase of business.  The most, if not all, of these States have seen the impolicy, improvidence, and unconstitutionality of their former course, and have recently, by a series of able and convincing decisions, proven the error of their earlier opinions.  The Courts of New York, Wisconsin, Pennsylvania, Michigan, and those of other States have recently had this question under consideration; and it is gratifying to every lover of constitutional law to observe that they are all returning to the old landmarks, admitting, as they all do, the danger of abandoning, for any cause, the rule of strict construction and rigid adherence.

I admit, if the Act be within the powers granted by the Constitution, that we are not permitted to discuss its propriety or advisability; but I deny that the Legislature is the sole judge of the legality or constitutionality of its acts, and that the Act in question is constitutional and valid, as a law, because it emanates from the law-making power—the

egislature. I deny, also, that the restriction or inhibition pon legislative action must be found within the letter of the Constitution; that the negative must be averred in the instrument. On the contrary, I insist that we are at liberty to take the whole instrument, and, construing it as we would any other law, determine from it whether an Act be repugnant to it, even when we can find no absolute negative in the letter, nor any single word or sentence which contains any such negative. (See *Nougues* v. *Douglass*, 7 Cal. 65; *French* v. *Teschemaker*, 24 Cal. 518; *Bourland* v. *Hildreth*, 26 Cal. 161; *Ferris* v. *Coover*, 11 Cal. 175.)

Upon examining the Constitution—and particularly Article I, sections eight, eleven, and twenty-one; Article IV, section thirty-seven; and Article XI, sections ten and thirteen—it will be found that freedom of person, of speech, of action, of property, freedom for the masses, protection to the people, is the utterance of every line, is the expression of every sentence, of the instrument; and, to make the proposition beyond contradiction, the instrument in express words declares that "this enumeration of rights shall not be construed to impair or deny others retained by the people." While, therefore, it is admitted that the Legislature, being the supreme law-making power of the State, has discretion in legitimate taxation, it is insisted that its power extends no further, and that, in going beyond legitimate taxation, its action becomes usurpation, just as much as if it were assuming to do acts wholly without its constitutional power.

All the writers upon the subject of taxation agree in confining its objects to public uses and purposes. (See Webster, Bouvier, Burrill, Story on Const. 472; Blackwell on Tax Titles, 1.) The right and power of taxation, from its very nature, must exist in the sovereign power. The consideration going to the citizen for the taxes he pays is protection to himself, his family, and his property; and if he gets none of this consideration for the money he pays, there

is no mutuality of benefit, and his substance is taken without any corresponding advantage to him in return. In the very nature of things, he can get this protection from none but the supreme, the sovereign, power; hence, it follows that the power of taxation is a sovereign power, and cannot exist in any but the sovereign. If exercised by any other than the sovereign, its delegates or agents, it is a usurpation. Now, for what purposes may taxation be imposed? Clearly, for only such purposes as are contemplated in the contract between the Government and the citizen; for only such public uses as bring about the result intended—the support and maintenance of the Government, the sovereign, whose protection is earned by the taxpayer. There is a mutuality, a dependence, the one upon the other. This creates harmony; and outside of this, there is neither harmony nor community of interest. If the power of taxation goes further than this, it ceases to be taxation, and becomes plunder. (*Lumston* v. *Cross*, 19 Wis. 284; *Soens* v. *Racine*, 10 Wis. 250; *Foster* v. *Kenoshe*, 12 Wis. 620; *Hosbrook* v. *Milwaukee*, 13 Wis. 134; Brown's Legal Maxims, 3, and note.)

The Legislature cannot levy a tax for merely private and individual purposes, neither can they authorize a municipal corporation to do so—but only for some object of public or common interest. (*Soens* v. *Racine*, 10 Wis. 271; *Broadhead* v. *Milwaukee*, 19 Wis. 624; *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 108; *Whiting* v. *Sheboygan R. R. Co.*, 25 Wis. 167; *Detroit and Howell R. R. Co.* v. *Town of Salem*, — Mich. [not yet reported]; *Hanson* v. *Vernon*, 27 Iowa, 28.

Again, if the consideration averred in the petition, that the contemplated railroad is an enterprise of great utility to the people of the State at large, and especially to Stockton and the surrounding towns and counties, is sufficient to render this enterprise such as to entitle it to have taxes levied and given for its support, then the surrounding towns and counties and the people of the whole State should share

equally in the burden of taxation.    (Const., Art. XI, Sec. 15.) But this is not a sufficient consideration; it is not such *public use* as is the legitimate subject of taxation.    So far as the public is concerned the incidental advantage to be derived from this enterprise is not a *public use.*    The railroad company is a private corporation just as much as any other. (Angell & Ames on Cor., Secs. 14, 30, 36.)    The respondent is not a stockholder, and will not be benefited by the *gains* of the enterprise—these go into the pockets of private citizens, while the taxpayer foots the bills.    I can see neither law nor justice in forcing one man to give his money to another, or to a corporation, who desire to use it for the purpose of building a railroad, any more than any other enterprise.    To my mind the later and better authorities clearly establish the proposition, that a municipal corporation has no authority to donate the money of its taxpayers to a private corporation, and that a corporation for building railroads for its own private gain is a private corporation.    The Legislature has no constitutional power to apply or to loan the money of such municipal corporation or of its citizens to any such use; and the Act under which the petitioner claims is unconstitutional and void.

[The briefs of counsel in this case were numerous and lengthy.    On the part of the petitioner, Messrs. McConnell and Hall filed three, and S. W. Sanderson filed two, one of them containing also a certified copy of the late opinion of the Supreme Court of Iowa in the case of *J. R. Stewart* v. *The Board of Supervisors of Polk County.*    On the part of the respondents, Jo Hamilton, Attorney General, filed three briefs, and Messrs. Hale & Edmonds one.]

By the Court, Wallace, J.:

An Act was passed by the Legislature at its late session, and approved on the first day of April, 1870, which is en

titled "An Act to empower the City of Stockton to aid in the construction of the Stockton and Visalia Railroad." (Acts 1869–70, p. 551.)

In substance it directs the municipal authorities of the City of Stockton to donate three hundred thousand dollars to a company who propose to build a certain railroad, having a permanent terminus in the city itself, at its water front. Under the provisions of the Act the bonds of the city for the entire sum are to be placed in the hands of three gentlemen named in the Act, who are thereby created a Disbursing Board, and who are to deliver the bonds to the company in designated sums, from time to time, as the work shall progress. These bonds are to bear annual interest, accruing at a fixed rate; and to pay this interest, as well as to discharge the principal sum mentioned in the bonds, the Act directs the municipal authorities of the city to levy an annual tax, in the same manner in which city taxes for general municipal purposes are collected, etc. The authorities of the city have pursued the directions given them by the Legislature, so far as to prepare and deliver the bonds to the Disbursing Board; but they now refuse to levy the tax to pay the accruing interest thereon.

To compel them to do this the present application for a mandamus is made by the railroad company.

The application is resisted by the city upon a single ground—"that said Act of April 1, 1870, and all the provisions thereof, are, and ever have been, repugnant to, and in violation of the Constitution of the State of California."

It is thus made apparent that the case here must turn wholly upon the question of constitutional power in the Legislature to enact the statute, and that our duty begins and ends with a consideration of the mere point of law presented.

This is so obvious that no one will controvert it. It is so plain of itself that no reasoning nor process of demonstration

could make it clearer. But, self-evident as it is, a perusal of the voluminous printed arguments on file admonishes us that it is not so plain but that it may easily be forgotten. Surely we are not here to pass upon the motives of the authors of the statute. Though "corruption may invade the halls of legislation, and the interests of the people be betrayed by their chosen representatives," and though "the Executive may prove faithless to his trust," the constitutional authority of these functionaries to enact this statute would, nevertheless, be precisely as broad and deep in its measure as though the Act in question were admitted to have found its inspiration in the wisest statesmanship and the purest public virtue.

It is unavailing, therefore, that the counsel for respondents should come here to complain that "it is notorious that the facility of influencing legislative bodies is such that the passage of any measure can be secured through the usual appliances;" for even if, unfortunately, this be true, it is also true that we have no authority to reform these "legislative bodies," nor to call them to account for the manner in which they may have conducted the public business intrusted to their hands. Questions, too, which regard the mere policy of the statute—inquiries as to whether it is in itself a wise law or a foolish law; whether its anticipated operation will be to promote or to retard the true prosperity of the people—are not for us to consider; for these, and other questions cognate to these, involve the field of mere political inquiry, which it does not become us to enter, and which we cannot enter, except we overleap the barriers by which the limits of our rightful authority are plainly defined.

We have deemed it proper to say thus much *in limine*, in order that our purposed silence in regard to these matters, concerning which it is our duty to be silent here, may not be misconstrued or misunderstood.

The case before us requires an examination at our hands

into the authority of the Legislature to enact the statute in question.

The authority of the judiciary in this country to consider of the extent of the legislative power in the enactment of laws was formerly denied *in toto,* and it will be remembered that in the early days of the Federal Constitution some of the most distinguished public men, among whom was Mr. Jefferson, maintained the opinion that no Court had the rightful authority to declare a statute unconstitutional which had received the sanction of the popular will, acting through its chosen representatives. It is known, too, that an impeachment of a Judge of a State Court of the highest grade was, at a later period, instituted for an attempt upon his part to uphold this power, admitted to be anomalous, and that upon his trial but a single vote was wanting to his conviction of the charge of usurpation of authority in his office.

Though the power itself is now admitted, it is, nevertheless, conceded to be always one of the utmost delicacy in its exercise, and never to be exerted except when the conflict between the statute and the Constitution is palpable and incapable of reconciliation. To this effect the authorities are substantially uniform.

In *Santo* v. *The State of Iowa,* 2 Iowa R. 208, Mr. Justice Woodward, in delivering the opinion of the Supreme Court of Iowa, unanimous on this point, said:

"For some time after the establishment of the State Government, it was doubted whether the judiciary possessed authority to declare and hold an Act of the Legislature unconstitutional and void, and the exercise of the power was declined by some Courts. And now, although the power is universally admitted, its exercise is considered of the most delicate and responsible nature, and is not resorted to unless the case be clear, decisive, and unavoidable."

And said the Supreme Court of Indiana (4 Ind. 344): "Such questions (involving the constitutionality of statutes) are

always regarded by the Courts as of serious importance. The judiciary look to the Acts of the Legislature with great respect, and reconcile and sustain them if possible. The General Assembly is the immediate exponent of the popular will—expressly delegated to clothe that will with the forms of law. The presumption that such a body has sanctioned enactments in violation of the Constitution is not to be lightly indulged. That the Act is imperfect or impolitic is not enough. These defects subsequent legislation can remove by amendment or repeal. To bring its validity within the control of the Courts, it must be clearly subversive of the Constitution."

See, also, *Rice* v. *Foster*, 4 Harrington, 479; *Fisher* v. *Mc-Gier*, 1 Gray, 1; *Commonwealth* v. *William*, 11 Penn. 61, where the Supreme Court of Pennsylvania say: "Of late years it has been much the fashion to impeach the action of the legislative bodies as unconstitutional, when it happened not to accord with the party's notion of propriety and abstract right. This is very frequently done in sheer oblivion of the doctrine that express prohibition or necessary implication is essential to oust the State Legislature of authority."

We think that the adjudications in this Court give the correct definition of the judicial power to declare a statute unconstitutional, as now maintained by the general current of authority. It is said (12 Cal. 384) that it "should never be exercised unless there be a clear repugnancy between the inferior and the organic law."

Again (17 Cal. 30): "But the legislative department, representing the mass of political powers, is no further controlled, as to its powers, or the mode of their exercise, than by the restrictions of the Constitution. Such restriction must be shown, before the action of the Legislature, as to fact or mode, can be held invalid."

Again (17 Cal. 551): "But it is equally well settled that this power (to declare an Act of the Legislature unconstitu-

tional) is not to be exercised in doubtful cases, but that a just deference for the legislative department enjoins upon the Courts the duty to respect its will, unless the Act declaring it be clearly inconsistent with the fundamental law, which all members of the several departments of the Government are sworn to obey."

The law-making power is, in its essence and nature, the supreme power in the State, and the Legislature, in its exercise, impersonates the aggregated sovereignty of the people themselves.

Hence it results that the Legislature is politically omnipotent, except in those particulars in which its power has been limited, qualified, or absolutely withdrawn by the provisions of the Federal or the State Constitution. Said Chief Justice Black, in speaking of this feature of our organized political system: "If the people of Pennsylvania had given all the authority which they themselves possessed to a single person, they would have created a despotism as absolute in its control over life, liberty, and property as that of the Russian Autocrat. But they gave a portion of it to the United States, specifying what they gave, and withholding the rest. The power not given to the Government of the Union was bestowed on the Government of the State, with certain limitations and exceptions expressly set down in the State Constitution. The Federal Constitution confers powers expressly enumerated; that of the State contains a general grant of all powers not excepted. The construction of the former instrument is strict against those who claim under it; the interpretation of the latter is strict against those who stand upon the exceptions, and liberal in favor of the Government itself. The Federal Government can do nothing but what is authorized expressly or by clear implication; the State may do whatever is not prohibited." (*Sharpless* v. *Mayor of Philadelphia*, 21 Penn. St. R. 160.)

These general views found early expression in this Court (*People* v. *Coleman,* 4 Cal. 46; *Thorne* v. *San Francisco,* id. 157), and have since been steadily maintained here. (6 Cal. 89; 13 Cal. 159; 17 Cal. 547; 26 Cal. 183.)

Whenever, therefore, it is alleged that a statute which has been enacted in due form by the legislative department of the Government of this State is, indeed, in excess of its authority to enact, it is necessarily the allegation of an exception to the contrary of an admitted general rule; and, therefore, the construction is "strict against those who stand upon the exception, and liberal in favor of the Government itself."

Hence, when we are called upon to declare that there was no authority for the Legislature to enact a particular statute, it is necessary that we be pointed to the clause or clauses of one or the other, or both, of these Constitutions, supposed to have taken away the power entirely, or limited it to something else than the subject to which the Legislature has applied it. It will not do to talk about the "spirit of the Constitution" as imposing a limitation upon the legislative power. The limitation ought to be something definite in itself—as definite as a sum to be subtracted from a larger one, in order to ascertain a balance.

The "spirit of the Constitution" as an interdiction upon legislative power was repudiated by this Court, in *Patterson* v. *Board of Supervisors of Yuba County,* 13 Cal. 182, in which Mr. Justice DANIEL, of the Supreme Court of the United States, is mentioned as having said that "if Judges were to adopt the notion that a law might be declared unconstitutional because of its supposed repugnance to the spirit of the Constitution, they ought to employ a rapping medium to procure authentic revelations from that spirit." The "spirit of the Constitution," as a means to ascertain the powers of other departments, would partake too much of the personal spirit of the individual Judges chosen for the

time being to interpret that instrument, and, chameleon-like, it would be apt to prove white, or gray, or red, or bluish, or bottle green, as the peculiar views of those having the spirit in their keeping might give it color. However it may be urged upon a Court as a standard by which legislative power is to be measured in a particular case, such as that now at bar for instance, we think that even those who so urge it would hesitate long before they could be brought to inscribe it upon the Constitution itself, that the powers of each of the departments of the Government should actually be limited by the "spirit of the Constitution," as from time to time declared by the Courts.

The rule which requires that an alleged limitation upon the powers of the State Government should appear either by the words which the people have employed for that purpose, or by an implication necessarily flowing from those words, and without which the words themselves cannot have their natural force and fair import, is firmly established.

It assumes, and correctly assumes, that it was the intention of the people that their representatives should exercise all political power, except such as the people themselves have singled out, and have either forbidden to be exercised at all, or permitted to be exercised only upon certain conditions, and under stated circumstances.

If, however, there be among the great powers of government a single one upon which, more than upon any other, we would anticipate that the intended limitation of the power would have found exact and careful expression upon the face of the Constitution itself, that one would be the power involved in the case at bar—the power of taxation; for it is notorious that in this country and elsewhere (everywhere that government has found an organized existence among men), it has, more than any other, perhaps more than all other powers together, proven to be the exhaustless source of political disquiet and disturbance in the body politic. Its

general history has been much the same in all countries where the people have aspired to be free, and have sought to obtain guarantees for the safety and the protection of their property against the unreasonable or irregular exactions of Government.

To go back somewhat less than three hundred years in the history of the country from whose political polity many of the most important features of our own system have been derived, we find an important tax controversy pending upon the point of the power to impose taxes upon the people, and the particular inquiry was, whether that power belonged to the King, by virtue of the royal prerogative, or was only to be exercised by the people themselves, through their representatives in Parliament.

It was in 1606 that Bates' case arose, upon an information in the Exchequer, in which the question was distinctly presented. It was recognized as one of surpassing importance to the English people, and, in his argument against the asserted power of the Crown in that case, Mr. Yelverton gave expression to the popular view of the day when he said: "It is not what we shall be called, or how we shall divide what we have, but whether we shall have anything or nothing."

Bates' case was determined by the Court in favor of the Crown, as were other like cases which followed—among them the celebrated case of Hampden concerning the ship money. The controversy thus waged in the Courts led at last to the long and disastrous struggle which culminated in the overthrow of the Government and the establishment of the Protectorate. That all taxes must be laid by the people, through their representatives in Parliament, has been since firmly maintained in England. At the Restoration, even, amid the general national joy at the welcome event, it was not forgotten to resolve, that to tax in any other manner than "in Parliament is against the law of the land." The House

of Commons alone has authority to originate bills of supply, and the upper branch of Parliament has no power to even amend such a bill, for the House of Commons only is composed of the representatives of the people.

In this country the Revolution, as is well known, originated in the same idea, so firmly fixed on the popular mind, that taxation should be imposed on the people only through their chosen representatives. Hence, in organizing the Federal Government, the House of Representatives was given the sole power of originating bills for taxation (Const. U. S., Art. I, Sec. 7); and various constitutional provisions upon this particular subject are to be found in the State Constitutions of some thirty-three of the States, in some of which the rule, that measures of taxation must originate only in the popular branch of the Legislature, is preserved, and in the others qualified or abrogated altogether.

It would be somewhat strange, in view of this history, if it should, after all, appear that those who framed the Constitutions of the State Governments in this country, and especially that of the State of California, should have, through mere inattention, failed to limit the power of taxation in every respect which was deemed practicable. We accordingly find in the Constitution of California, in section thirteen, Article II, an important limitation, not, indeed, upon the extent of the power itself, but upon the mere mode upon which it is to be exerted. Taxation is thereby required to operate equally and uniformly, and upon the ad valorem principle. No attempt was made to limit the *power* itself in the hands of the State Government. The Convention at Monterey knew very well that such an attempt would be an attempt upon the safety of the government which it was their purpose to establish—not imperil.

Taxation originates in the financial necessities of government. Those necessities are in themselves illimitable by human agency. The means of the supply, to be adequate,

must be illimitable too.   It cannot be foreseen by the framers of the Constitution, who would limit the power of taxation, what may be the necessities of the Government, at a given time, or under the pressure of attack from without or insubordination within its borders, or what pecuniary means it may need in its possible struggle with those difficulties which it is the very purpose of organized government to meet and overcome.   To assure the public safety, therefore, dictates that the State be clothed with power to command its entire material resources.

Hamilton, in elaboration of this truth, says: "Money is with propriety considered as the vital principle of the body politic—as that which sustains its life and motion, and enables it to perform its most essential functions.   A complete power, therefore, to procure a regular and adequate supply of it, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every Constitution.   From a deficiency in this particular, one of two evils must ensue; either the people must be subjected to continual plunder as a substitute for a more eligible mode of supplying the public wants, or the Government must sink into a fatal atrophy, and in a short course of time perish."   (Federalist, No. XXIX.)

The possible financial necessity of the Government may require all the wealth within its limits.   The extent of the actual necessity is for the Legislature to determine in all cases; this is political power.   It is the power to exhaust the substance of the people by a levy equal in amount to their aggregate wealth.   Hence it was aptly said by Chief Justice Marshall, more than fifty years ago, in speaking of the power of taxation, as it existed under the American Constitutions in his day, that "the power to tax involves the power to destroy."   (*McCulloch* v. *The State of Maryland*, 4 Wheaton, 316.)

In the same case, the same great authority adds (p. 428):

" The only security against the abuse of the power is found in the structure of the Government itself. In imposing a tax, the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a State, therefore, give to their Government a right of taxing themselves and their property, and as the exigencies of Government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislators, and on the influence of the constituents over their representatives to guard them against its abuse."

The Convention at Monterey understood well that they had not limited the power of taxation in the State Government, and they understood, too, the reason why they could not venture upon the experiment. This is seen by section thirty-seven, Article IV, where they provide for restricting the power of municipal corporations to impose taxes. This restriction of the power of taxation in the hands of municipal corporations could be safely imposed, because the safety of the State was not supposed to be committed to the municipalities, in general charged with duties of a mere local and police character. That the Convention would have imposed a similar or some limitation upon the taxing power of the State, had it been considered advisable at that day, cannot be doubted, for they limited the public indebtedness to a fixed sum, except under peculiar and named circumstances (Article VIII); and they utterly prohibited the loaning of the public credit for private purposes under any circumstances whatever (section ten, Article XI); but they omitted, and evidently *ex industria*, to place any limitation upon the mere power of the State to impose taxes. The principle upon which taxation is to be imposed by the State Government is pointed out by the Constitution, but the extent to which it may be carried is left unlimited, except by legisla-

tive discretion.    It is to be exerted to raise money for public use.

The "public use," though mentioned in the Constitution, is not mentioned with reference to the power of taxation, or in connection with any limitation upon that power contained in that instrument.

It is declared (section eight, Article X) that private property shall not be taken for "public use" without just compensation.    No constitutional definition of the words "public use" is, however, given in that instrument.

For much the same reason as that already mentioned, concerning limitation upon the power of taxation in the hands of the State Government, the "public use," upon which the power of eminent domain was to be exerted, seems to have been left, in large measure, to the determination of those who were clothed with its exercise, in view of possible contingencies with which they might be called to deal, rather than to attempt its restriction by anticipation.

"Public use," "public purpose," and "public policy" are much the same in import.    "Public policy"—the policy upon which governmental affairs are conducted for the time being—is legislative policy in the main, and "public use" and "public purpose" are largely dependent upon this policy—notoriously varying in our country, from time to time, with the accession to power of political parties, differing from each other as to the system of measures best adapted to promote the interest of the State.    The resolve of a legislative body, by which a tax is imposed, or private property taken, is, therefore, necessarily a legislative determination, that a public use is to be promoted by the tax, or the taking directed; and such a determination is the determination of a merely political question by the political department of the Government.

The Legislature, in the case before us, having determined the construction of the contemplated road from Stockton to

Visalia to be a matter of public concern, and as such authorized taxation to aid in the work, the question arises as to how far that determination is open to review in the Courts. That question was answered by this Court in the case of *Napa Valley Railroad Company* v. *Napa County*, 30 Cal. 437: "Railroads concern the public interest as matter of legal judgment, and however that conclusion may be opposed to the fact in the case at bar makes no difference, the action of the Legislature on the question not being open to review by the judicial department of the Government."

If we could review the legislative determination upon that point at all, a question would necessarily arise as to the extent to which that review could be carried here. Could we substitute our judgment upon the point for that of the legislative department absolutely, as we sometimes substitute our judgment for that of a Court from whose judgment an appeal has been prosecuted to this Court? If it was the intention that we should do so, it would seem that the law should have pointed out some mode by which we could get before us, in an authentic form, the facts and circumstances upon which the legislative department proceeded in the particular case. In the absence of a knowledge of these facts and circumstances we would ordinarily be unable to say that an error had been committed at all. A case might, indeed, be presented in which it might appear, beyond the possibility of a question, that a tax had been imposed, or the property of a citizen had been taken for a use or purpose in no sense public; or, in the language of Chancellor WALWORTH (5 Paige, 159), "where there was no foundation for a pretense that the public was to be benefited thereby," and in such case it would be our duty to interfere and afford relief. But should we interfere in any other than such a case, we would but substitute a policy of our own for the

legislative policy in the conduct of the affairs of the State, and substitute our will for that of the representatives of the people. The legislative judgment may have discovered a public use and a public benefit in the encouragement of a particular class of improvements in the State; it may be a public use in the building of a bridge, a road, or a mill, and may, in that view, aid its construction by giving the public funds towards that end. We may be ourselves unable to see why the particular work thus selected for Government aid should be preferred to another work of equal, or, perhaps, in our judgment, of even greater public importance, but which has, nevertheless, been wholly overlooked; but we cannot, upon such a view, forbid the Government aid to the work selected, any more than we could direct a similar bounty to the other work, in our opinion unreasonably omitted. In Tennessee, for instance, a statute declared, at an early day, when grist mills were probably scarce, that every grist mill which should thereafter be built, and should at any time grind for toll, should be held and deemed, "and is hereby declared, to be a public mill." It is further provided that the miller should grind according to turn; that he should grind the grain well, if water would permit; that he should take no more than one eighth of the grain for grinding; that he should keep a certain description of grain measures, and then follows a penalty for keeping false measures or violating the other provisions of the statute. Under this statute one Goodlett applied, in 1832, to condemn the lands of one Harding, for the purpose of erecting a grist mill, sawmill, and paper mill thereon. The Supreme Court of Tennessee, upon this application, said: "The grist mill is a public mill. The miller is a public servant. He is allowed a compensation for grinding, etc. * * * It will appear, from what has been said, that when an acre of land is taken from any citizen for the purpose of erecting a grist mill, though the title be vested

in another citizen, yet that vestiture is for a public use, and is wholly different from the case of taking property from one man and giving it to another for his private benefit only. * * * The petitioners say they are desirous to build a grist mill, sawmill, and paper mill. For these purposes they ask to have Harding's land vested in them. The sawmill and paper mill will have no public character; the erection of these mills would be wholly for the private use of these petitioners. To take Harding's land for such use would be unconstitutional." (*Harding* v. *Goodlett,* 3 Yerger, 53.)

The Legislature of Tennessee, in pursuance of a policy of its own, had seen fit to declare that a grist mill, grinding for toll, was a mill for public use—therefore the Court held it to be such. But the Legislature had not declared that a sawmill or a paper mill, however conducted, should be considered a public mill—therefore the Court could not hold them to be other than private in character. This case arose and was decided nearly forty years ago. The Court did not, at that day, undertake to announce a policy of its own and set it up against the policy of the legislative branch of the Government. It did not argue, either, that the circumstance that the miller operated the mill for his "private profit," and received one eighth of the grist for grinding, necessarily made the mill private, and not public, in point of constitutional law; nor did it stop to inquire whether, if a grist mill operated in that way was indeed to be considered a public mill, it ought not to follow that a paper mill or a sawmill, working on the same terms, would also be public. The Court seems to have been of opinion that legislative policy has something to do with determining "public use" and "public purpose," and that it was just possible that Tennessee legislative policy might determine that the erection of grist mills in that State would promote a public purpose there, which would not be pro-

moted by the erection of sawmills or paper mills. The Court seems to have been of opinion that this was a matter for legislative determination, and it accordingly upheld the authority of the Legislature to declare grist mills, though grinding for the " private profit " of the miller, to be public mills; it has not been suggested, either, that at that time the grist mill interest controlled the Legislature of the State of Tennessee or the decisions of her Courts. The true rule to be extracted from the cases, and which is applicable to the case at bar, is that if it is possible that the work or object selected by the Legislature for aid concerns the public use we must consider that it does in fact do so. If it is possible, therefore, that the City of Stockton may have a public interest in this railroad, then the legislative action is conclusive here that the city does, in fact, have such a public interest therein.

In the Sharpless case, supra, Chief Justice Black (speaking of the Acts under which Philadelphia aided in the construction of certain railroads), expressed this view when he said: " But it is not our business to determine what amount of interest Philadelphia has in either of these improvements. That has been settled by her own officers and by the Legislature. For us it is enough to know that the city may have a public interest in them, and that there is not a palpable and clear absence of all possible interest perceptible by every mind at the first blush. All beyond that is a question of expediency—not of law—much less of constitutional law." In Connecticut the rule by which the Court interprets the legislative action in such a case was declared in *Booth* v. *Town of Woodbury*, 32 Conn. R. 128. The Town of Woodbury was supposed to be bound to furnish thirty-two men to serve in the Federal army, under the call of the President during the late civil war. The Selectmen of the town, under instructions of a town meeting, proceeded to raise, on account of the town, some six thou-

sand dollars, to be applied towards hiring substitutes for such citizens of the town as might be drafted thereafter, and the Legislature of the State subsequently ratified these proceedings by which this gratuity was given by the town.  The Court say: "In the first place, if it be conceded that it is not competent for the legislative power to make a gift of the common property, or of a sum of money to be raised by taxation, where no possible public benefit, direct or indirect, can be derived therefrom, such action of the legislative power must be of an extraordinary character to justify the interference of the judiciary, and this is not that case.  Second, if there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy  *  *  *  and the determination of the Legislature is conclusive.  And such is this case.  Such gifts to unfortunate classes of society, as the indigent blind, the deaf and dumb, or insane, or grants to particular colleges or schools, or grants of pensions, swords, or other mementoes for past services, involving the general good indirectly and in slight degree, are frequently made and never questioned."

Upon a similar question before it, the Supreme Court of Wisconsin expresses substantially the same views.  It said: "To justify the Court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at first blush."  (*Broadhead* v. *The City of Milwaukee*, 19 Wis. R. 652.)

In *Schenley* v. *City of Alleghany*, 25 Penn. R. 130, the Supreme Court of Pennsylvania say "that the exercise of the taxing power by the Legislature must become wanton and unjust—be so grossly perverted as to lose the character of a legislative function—before the judiciary will feel themselves entitled to interpose on constitutional grounds.

To arrest the legislation of a free people, especially in refer-
ence to burdens self-imposed for the common good, is to
restrain the popular sovereignty, and should have clear war-
rant in the letter of the fundamental law."

In his work on constitutional limitations (p. 488), Judge
Cooley (perhaps the ablest living commentator upon consti-
tutional law) says: "It must always be conceded that the
proper authority to determine what should and what should
not properly constitute a public burden is the legislative
department of the State, * * * and in determining this
question the Legislature cannot be held to any narrow or
technical rule. Certain expenditures are not only absolutely
necessary to the continued existence of the Government, but
as a matter of policy it may sometimes be proper and wise
to assume other burdens which rest entirely on considera-
tions of honor, gratitude, or charity. The officers of the
Government must be paid; the laws printed; roads con-
structed, and public buildings erected; but with a view to
the general welfare of society, it may also be important that
the children of the State should be educated, the poor kept
from starvation, losses in the public service indemnified, and
incentives held out to faithful and fearless discharge of duty
in the future by the payment of pensions to those who have
been faithful public servants in the past. There will, there-
fore, be necessary expenditures, and expenditures which rest
upon considerations of policy alone, and in regard to the one as
much as to the other the decision of that department to which
alone questions of State policy are addressed must be accepted
as conclusive." Again (at page 487), the same author, after
stating that taxation can be imposed for public purposes
only, says: "In this, however, we do not use the word *public*
in any narrow and restricted sense, nor do we mean to be
understood that when the Legislature shall overstep the
legitimate bounds of their authority the Courts can interfere
to arrest their action. There are many cases of unconstitu-

tional action, by the representatives of the people, which can be reached only through the ballot box, and there are other cases where the line of distinction between that which is allowable and that which is not, is so faint and shadowy that the decision of the Legislature must be accepted as final, even though the judicial opinion might be different."

Other, and like authorities, might be cited upon this point, but we think that without further reference to them it is plain enough that when the Legislature has determined a given purpose to be a public purpose, we must so consider it, unless we can see at first blush that it is not possible that it could be such. The field of legislative policy is vast in extent. It embraces in its ample range whatever can be supposed to promote the interest of the body politic, enhance the public revenue by increasing the values of objects to be taxed, facilitate the free interchange of commodities, or improve the social, moral, or physical condition of the community. These, and almost innumerable other and like purposes, favorably affecting, it may be, some particular individuals more directly than others, and benefiting particular interests or localities to a greater degree than other particular interests or localities, are supposed in the general judgment of mankind to be in some degree promotive of the material welfare of the State, and therefore fall within the constitutional power of the Legislature, as being purposes of a public character, to be fostered and advanced in its discretion. Within this broad range it is for the Legislature to select such objects as in its judgment may appear as deserving the munificence of the Government, and in so doing "the Legislature, as we have seen, cannot be held to any technical or narrow rule." It will not probably surprise any one to be told that the discretion to determine what is and what is not in this sense a public purpose is confided to the Legislature, and that in the exercise of this discretion that body may, and, indeed, habitually does, clearly over-

step the mere actual necessities of the public administration. The popular understanding of the legislative power in this respect, derived from the known habits of the Government, must be found to be in accord with the learning of the books which treat of it. In California, for instance, did any one seriously question the authority of the Legislature to appropriate the public moneys to meet the personal wants of the overland emigration of 1852? Yet, in the absence of the legislative discretion involved, who could maintain that in point of mere constitutional law the overland emigrants had any right to be fed and clothed out of the public treasury more than other people. .

Again: who has come to deny the validity of the legislative appropriation by which thousands of dollars have been and are being annually paid to General Sutter for his "private profit," as the respondent's counsel would express it? It is no answer to say that the appropriation of 1852 was prompted by a commendable sentiment of humanity, and that the pension to General Sutter is but the expression of the public gratitude towards a distinguished citizen whose personal kindness and generous conduct have justly won for him the popular esteem. These motives, however worthy in themselves, cannot be made to supply the requisite constitutional authority to give away the public moneys.

If the three hundred thousand dollars claimed by this railroad company be regarded as a mere gift of that much of the public moneys, it must, nevertheless, be upheld by the same construction of legislative power which would support the pension to Sutter. There is no provision of the Constitution which will authorize the gift to Sutter and deny it to the railroad company. The power to select the object of legislative bounty belongs to the Legislature itself, as well as the power to fix the amount to be given away. It will be difficult to draw the line of constitutional distinction between the legislative gratuity to Sutter for reasons of a

public nature looking to the past, and the like gratuity to the railroad company for reasons of a public nature looking to the future.

We have mentioned the pension to Sutter, and the aid to the overland emigration of 1852, because they are prominent, but at the same time not exceptional instances of the exercise of legislative authority in the general history of the State Government under its present Constitution. Many other and similar instances may be mentioned. Premiums payable out of the public moneys have been habitually offered for the encouragement of mere private industry. The production of sugar from sorghum, the manufacture of molasses, the production of flax, hemp, cotton, tobacco, hops, raw silk, and the manufacture and production of various other articles by private parties and for "private profit," were stimulated by the offer of large sums from the public treasury, by the "Act for the encouragement of agriculture and manufactures in California." (Acts 1862, p. 415.) This policy is further maintained by the Act of April, 1866 (p. 660), "for the encouragement of silk culture in California," by which premiums are offered by the State for the growing of mulberry trees and production of silk cocoons, and the constitutionality of the Act was not even questioned here in *The Attorney General* v. *The State Board of Judges*, 38 Cal. R. 291, but the statute was substantially reënacted in 1868 (p. 699); and an examination of the legislative Acts will disclose other like instances of the habitual expenditure of the public moneys, the validity of which no one has undertaken to call in question. In view of this public history, it cannot surely be claimed in any quarter that legislative authority to expend public moneys in the State was ever understood to be confined to merely keeping the Government in motion.

Cal. Reps. XLI—23

It has, indeed, habitually and notoriously overstepped that limit to find uses of a public character to be fostered by the expenditure of public moneys, and having done so, it is the legislative judgment which must determine whether or not the public interests are concerned in promoting any particular aim or object to a sufficient degree to justify the expenditure. This makes up legislative policy, for it is legislative policy which selects the objects to be aided, and determines the extent to which that aid should be carried.

In the case at bar, it determined the Stockton and Visalia Railroad to be a road for public use, and that, as such, the City of Stockton might donate three hundred thousand dollars towards its construction.

As we have already said, under the rule laid down by this Court in *Napa Valley Railroad Company* v. *Napa County*, 30 Cal. 437, this legislative determination is conclusive upon this Court. It was there held that "railroads concern the public interest as matter of legal judgment," and that when the Legislature had determined that a particular road in fact concerns the public interest, its determination in that respect is not open to be reviewed by this Court.

Upon that authority we are precluded from any examination into the principal question which the respondent has argued here.

But even if the rule were otherwise the result would be the same. Should we undertake to review the legislative determination that this road concerns the public interest we could not disturb it, unless we are prepared to say that there is absolutely no possibility that the proposed road from Stockton to Visalia could in any degree promote the public welfare, and that there is an utter absence of all possible public interest in the enterprise, and that all this is so palpable as to be perceptible to every mind at the first blush.

We are to say this of a highway traversing a considerable portion of the State, and connecting two important com-

mercial points. It is conceded by the respondent that the road in itself is one which the State might have lawfully constructed at the public expense. It is said in *Blodgett* v. *The Mohawk and Hudson Railroad Company*, 18 Wend. R. 1, "That the Government have not only the power, but that it is emphatically their duty and interest to construct railroads where the public interest and convenience demand them, cannot admit of a doubt; for such purposes they are authorized to take private property upon rendering just compensation; and they are, in like manner, justified in exacting tolls from those who travel on them as a means to reimburse the State for their construction and reparation. * * * If, however, the State shall not deem it wise or expedient at its own expense to construct a railroad, can there be any doubt of its power to impart this authority to others?" The case involved the exercise of the power of eminent domain in behalf of a railroad company—the power of eminent domain, which is only to be exerted in aid of a "public use;" but, in our opinion, it is not the less an authority that taxation might have been imposed for the same purpose. There can be no difference between a "public use" which will authorize the taking of private property, in aid of a particular road, and a "public use" which will support the laying of a tax in aid of the same road. We do not say that the power of taxation and that of eminent domain are the same in all respects—they both, however, proceed *in invitum*—both proceed, too, upon compensation real or supposed. That of taxation upon the idea that the Government protection to the citizen is his compensation; that of eminent domain upon the money compensation provided by the Constitution.

In either case, however, the power must rest for support upon the public use to be promoted; and a quasi public use will not be sufficient in the one case more than in the other. Such a use as a quasi public use is unknown to the Consti-

tution, and is only an invention of those who, being driven to admit that the power of eminent domain may be exercised in aid of this road, are desirous, at the same time, to deny that taxation may be resorted to for the same purpose. The question as to whether taxation may be imposed in aid of such a road as this, has arisen and been directly decided under a Constitution not differing from ours in any point involved in the decision. Nearly twenty years ago the Supreme Court of Alabama had under consideration the validity of a statute to authorize the City of Mobile to donate three hundred thousand dollars to the Mobile and Ohio Railroad Company, who were building a road to run from the city toward the mouth of the Ohio River. The company building the road was, in the language of the counsel resisting the Alabama statute, "a private corporation composed of private individuals, who, to promote private fortunes, and to reap the advantage of private enterprise, had associated themselves together," etc. The Supreme Court, however, decided that the donation might be constitutionally made through the exercise of the taxing power. It said that the power of taxation " extends to the employment of all those measures and appliances ordinarily adopted, or which may be calculated to develop the resources of the State and add to the aggregate wealth and prosperity of the citizens; such, for example, as sundry outlets for commerce, opening of channels of intercommunication between different parts of the State," etc. (*Stein* v. *Mayor of Mobile*, 24 Alabama R. 614.)

That Court accordingly upheld the validity of a tax imposed upon the real estate in the City of Mobile for the purpose of raising three hundred thousand dollars, and donating it to a railroad company who were constructing a railroad to run from the city in the direction of the mouth of the Ohio River.

In fact, we think that it may be said that the entire cur-

rent of authority supports the constitutional validity of taxation imposed for such a purpose as that here in question.

It is not denied, for instance, that the State may, in the exercise of the power of eminent domain, take from the unwilling proprietor the lands necessary for the building of this road—a road to be operated by a corporation for its "private profit;" that is conceded by all the authorities. Yet such a taking can only be supported upon the theory of a "public use" to be promoted by building the contemplated road.

Can there be a "use" which is sufficient, in a constitutional point of view, to seize the property of one, and at the same time insufficient to authorize taxation upon the property of all? If so, we have not found it.

In 1851 the Court of Appeals of the State of New York held that the public use which would support the exercise of the power of eminent domain would also uphold the power of taxation, and that really the power of taxation was in itself only one mode of taking private property for public use.

Upon this point the Court said: "Private property may be constitutionally taken for public use in two modes: that is to say, by taxation and by right of eminent domain.   *   *   *   The right of taxation and the right of eminent domain rest substantially upon the same foundation.   *   *   *   Taxation exacts money or services from individuals as and for their respective shares of contribution to any public burden. Private property taken for public use by right of eminent domain is taken, not as the owner's share of contribution to a public burden, but as so much beyond his share."

We know that a distinction has, of late, been attempted between "public use" for purposes of eminent domain, and "public use" for purposes of taxation. In order to maintain the distinction, its authors have invented a new use, which is not exactly a public use, nor yet a private use, but

a quasi public use. This quasi public use is of course something essentially different from the true "public use" named in the Constitution, otherwise there would have been no necessity for the invention of a new use at all; for in this instance, as in others, necessity has proven to be the mother of invention. A quasi public use is, therefore, intended to be something more or something less than the "public use," pure and simple, mentioned in the Constitution, for that was found to be insufficient to maintain the desired distinction.

Those who have originated the phrase "quasi public use," have, however, omitted to give it a definition. Quasi, we understand to mean "as if," "as though," "as it were," etc. A quasi public use may be said, therefore, to be a use "as if" a public use, "as it were" a public use, "as though" a public use, but of course in reality not a public use at all. In fact, the term is employed for the sole purpose of distinguishing a mere fictitious public use from a real public use, and thereupon it is argued that the unbroken line of authority which concedes that the power of eminent domain may be exerted in favor of the road as being for public use, does not establish that the power of taxation may be exercised for the same purpose, because it is said that the public use which will support the former is not actual, but merely feigned—only quasi—but that the public use which is requisite to authorize taxation must be something more.

The result is that the license by which a citizen holds his money is of a higher and better character than the license by which he holds his land—reversing the rule by which the law is supposed to regard things real rather than things personal, and a "public use" to which one may lawfully refuse to contribute his money to-day is nevertheless one to which he may be compelled to surrender his house to-morrow.

But two or three of the Courts in the United States have in fact attempted to maintain a proposition so absurd in

itself. Those Courts were lately characterized by the Supreme Court of the United States as "standing out in unenviable solitude and notoriety." (1 Wallace R. 206.) Among them at that time was the Supreme Court of Iowa. Since the submission of the case at bar we have, however, seen the opinion of that Court rendered in *Stewart* v. *The Board of Supervisors of Polk County*, and not yet reported [since reported in 30 Iowa, 9], in which the distinction is exploded in the following language:

"The right to exercise the power of eminent domain in behalf of railroads and other improvements of public utility is recognized by all Courts, and denied by no one. While admitting the right it is said that the Legislature has no constitutional power to levy a tax on the property of the citizen in aid of a railroad corporation, because it is a mere private enterprise.

"It has been abundantly shown that the object for which the right of eminent domain is exercised is a public one, for public utility, for 'public use,' within the meaning of the Constitution; and that this right can be exercised in behalf of these corporations on no other grounds. If, then, the building of a railroad is a public object, so as to authorize the taking of the private real property of the citizen—the highest species of property—for a right of way, is it any less a public object for the purpose of receiving aid, through the medium of taxation, to assist in building the road upon such right of way? The right of eminent domain and the taxing power are both sovereign powers. The former is limited to public use by express words in the Constitution. The latter is not, nor is it limited at all. * * * Conceding, however, that the taxing power ought not to be exercised except in behalf of a public object, it is unquestionable that it may be exercised for public purposes—for any object that will justify the exercise of the right of eminent domain.

"If the State can, for any purpose, take the land of a

citizen, it may tax him for a like purpose. The object or purpose should be a public one in either case. But it would be absurd to say that the right of the citizen to prevent his property from being taken for other than public uses, which is secured by express constitutional limitation, may be overridden; but that his right to save his money from being applied, through the process of taxation, to other than public uses, which right is not embodied in the Constitution, must be respected. * * * If the taxing power cannot be constitutionally invoked in aid of railroads, neither can the power of eminent domain.

"If the Act under consideration is in conflict with the Constitution in that it taxes the people in aid of the construction of railroads (or rather allows the people to tax themselves), then all the legislation in this and every other State exercising the power of eminent domain in behalf of railroads and other like internal improvements are unconstitutional, and all the adjudications of the Courts, for more than a century sustaining such exercise of the right of eminent domain, are based upon false premises, and are erroneous."

The able opinion from which we have thus quoted at such length is the more interesting in view of the fact that it is apparently the conclusion of a struggle between the Legislature and the Courts, of some eighteen years duration in the State of Iowa, waged with varied success upon the very question now before us.

In the beginning of that struggle, which was in 1853, those who opposed the right of the people to vote upon the question of local taxation, placed it upon the ground it yet really occupies, notwithstanding the effort to mask it under an impossible distinction between a "public use" and a "quasi public use," so called. The argument which questions the legislative authority in this respect rests upon a fear, real or feigned, that the popular vote in a particular

locality is not to be trusted with the question of local taxation for the purpose of local improvement. It looks really to a line of demarcation which it would draw between the rich and poor in the same community, and it would deny to the latter the power to participate in imposing a burden to be borne in part by the wealth of the former. When this question, for instance, first came before the Supreme Court of Iowa, in 1853, KENNEY, J., who then dissented from the opinion of the majority of the Court, said: "If this doctrine is to obtain, then it is in the power of a bare majority of voters, destitute of property, to saddle a tax upon a minority, the only property holders in the county." But the judgment of that Court, as then delivered, did not yield to. the argument. (*Dubuque County* v. *Dubuque and Pacific Railroad Co.*, 4 Iowa R. 1.)

The Court determined in that case that an Act which authorized a popular vote with a view to the imposition of local taxation for local improvements was constitutional. In 1862, however, and after the personnel of the Bench had been completely changed, the question was again presented, and a similar Act was then held unconstitutional, and much upon the rich and poor idea announced by Mr. Justice KENNEY in 1853. The Court said in 1862 that the expressed opinions of the supreme tribunals of some fourteen or fifteen of the States had reached conclusions "not satisfactory to the inquiries and consciousness of the public heart," and it declared that the question would continue to obtrude itself upon the Courts until a decision was arrived at which "will leave the capital of private individuals * * * under the control and dominion of those who have it, to be employed in whatever field of industry and enterprise they themselves may judge best." (*State of Iowa* v. *County of Wapello*, 13 Iowa R. 393.)

The history of the question in Iowa illustrates, too, that· powers political are for the political representatives of the people, and not for the Courts, to exercise; for the authority of the Legislature in the premises, now conceded by the Supreme Court of that State, had been repeatedly asserted by the Legislature, and as often denied by the Court for several years preceding the late decision in *Stewart* v. *Board of Supervisors of Polk County*.

It is said, however, that in the case at bar the act is not "taxation" within the meaning of the Constitution, because it is "simply taking the money of one man and giving it to another," and that therefore it is not the raising of money to meet "the public consumption or expenditure," nor to provide "for the use of the State, nor for the use or benefit of the State Government." This proposition is based upon the alleged fact that the corporation which is to receive this money is a private and not a public corporation, and that the road itself, when built, is to be operated by the corporation for its own benefit and profit.

The general power of the State Government to build such a road as this one is admitted. The authority to build it upon the basis here adopted is denied; it is claimed that the power to construct the road cannot be exercised through the agency of the railroad corporation. It is not the power to construct, but the mode of its exercise, which is thus questioned. We might put this objection at rest by simply repeating the language of Judge Baldwin in delivering the unanimous opinion of this Court in a case already cited (17 Cal. 30): "But the legislative department, representing the mass of political powers, is no further controlled as to its powers, or the mode of their exercise, than by the restriction of the Constitution." What provision of the Constitution has declared that the Legislature, in the prosecution of an enterprise *per se* of an admitted public character, shall employ no private agency, or shall take care that no private

person shall derive a pecuniary profit thereby? or in what clause is there to be found a constitutional inhibition of the "mode" here adopted?

Too much prominence in argument here has, however, been imparted to this view to justify us in thus passing it by, conclusive as we deem the answer already given. At every step in the discussion upon the part of the city, we meet the multiform proposition that "public use" and "private profit" cannot go hand in hand in the prosecution of this enterprise; that there is a fatal antagonism between the two; and that the moment that "private profit" lifts itself into view upon one side of the proposed work, "public use" must disappear from the other. In a case involving the same objection, the Supreme Court of Massachusetts said: "But it is said that this grant was made upon the petition and for the sole benefit of an individual, and was not needed for the accommodation of the public. It is doubtless true that the leading motive of the defendant in erecting the bridge was private profit, and so almost all other enterprises, many of which have resulted in great public improvements, have originated in motives of private gain." To our minds, however, the fallacy involved is so apparent that neither illustration nor argument can set it in a clearer light. It is exposed by a mere reference to the usual and ordinary mode of conducting the public business. Government habitually moves through the agency of employés in executing its purposes; these employés must be compensated in some way; and here we come, unavoidably in every instance, upon the spectre of "private profit," which must, upon this view, frighten the Government from the prosecution of any public enterprise whatever.

If an incorporated stage company, for instance, should put in a bid for carrying the mails at a fixed compensation, would any one doubt that it was the sole purpose of the company to obtain for itself a portion of the public moneys? Would

any one attribute to it a motive of a less selfish character, or claim that a consideration of the public good had in the slightest degree actuated it in making its bid? Surely not. But, upon the other hand, if Government should accept the bid at the proposed price, would not its known purpose be to promote a public service of recognized importance? Could any one claim that its object in providing for carrying the mail was less public in its character because the prosecution of that purpose incidentally afforded "private profit" to the stage company? Surely not; yet the case we have supposed has been of constant occurrence from the earliest organization of the Government, in providing for the mail service.

We have instanced a familiar case by way of illustration. It might be indefinitely extended into all the varied circumstances in which Government is to be supplied—to public printing, army stores, etc.—in all which private profit is the avowed motive on the one side, and the "public service" the true object on the other.

In 1831, the case of *Beekman* v. *Saratoga and Schenectady Railroad Company*, 3 Paige, 73, was decided by Chancellor WALWORTH. In that case it appeared that a railroad company, in constructing their road from Saratoga Springs to Schenectady, had seized upon certain real estate in the exercise of the power of eminent domain. There, as here, no question was made but that the State of New York might have built the proposed road herself, and might have appropriated the land in question, and applied the public moneys also for that purpose. The objection of Van Vechter, for the complainant (whose pleasure grounds around his country residence had been invaded), was that "the defendants are a private corporation, and the road when made will be private property; it will not be for public use, but for the private use and emolument of the company," etc. In fact, the argument of the counsel for the complainant upon

that point presented it with a force never surpassed in any case falling under our notice. The Chancellor, in deciding the case, assumed, for the purpose of the decision, that the company was in truth a private company, in the exact sense claimed by counsel. He declares, however, that it belongs to the Legislature to determine if the public interest will in any way be promoted by the taking of private property for such a purpose. He states that it is upon this principle that lands of one private individual are permitted to be overflowed and condemned in order that another may obtain a mill site; and that not only agents of the Government "but also individuals and corporate bodies have been authorized to take private property for the purpose of making public highways, turnpike roads, and canals; of erecting and constructing wharves and basins; of establishing ferries; of draining swamps and marshes," etc. In all such cases the object of the legislative grant of power is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agent of the Government, or through the medium of corporate bodies, or of individual enterprise. And, according to the opinion of Chief Justice Marshall, in the case of *Wilson* v. *The Blackbird Creek Marsh Company*, 2 Peters R. 251, "measures calculated to produce such benefits to the public, though effected through the medium of a private incorporations, are undoubtedly within the powers reserved to the States," etc. It must be observed that the Chancellor in this case, following the view of the Chief Justice of the United States—each of them distinguished for learning and ability—holds that public improvements of this nature may be effected by the State Government, "through the medium of corporate bodies or of individual enterprise." But how is this power to be availed of, if the corporation or individual selected for the purpose is to derive no "private profit" thereby? Can such service be obtained without

pecuniary compensation in some way awarded?    The counsel has not suggested in this connection that it would be possible to find a corporation or an individual so public spirited as to undertake an agency in effecting the proposed public improvement without the expectation of "private profit" to accrue, nor is it believed that even in the earlier day in which the Chancellor and the Chief Justice lived private agencies of such a wholly disinterested character were to be readily found.    When it is said, therefore, that the Government possesses the power to prosecute a public enterprise through an agency private in its character, the power to compensate such an agency is at the same time necessarily conceded, for otherwise the power to make the employment would be practically incapable of execution, and a power incapable of execution is no power at all.

The power to compensate the private agency thus employed is therefore clear enough, and if this be so it must be admitted that the measure of that compensation and the mode in which it is to be afforded are mere details which will vary with the prevailing habits of the public service, the condition of the public treasury, or the mere policy which would seem to recommend one plan of making compensation as preferable to another plan.    Suppose, for instance, that the entire gross proceeds of the business are to be paid into the treasury of the State, and the "private agency" by which the road was built and is operated is to receive from the State a sum equal to a fixed per centum of the ascertained cost of the road, with or without allowance for deterioration by use, as the case may be, or that the net profits earned by the road are to be equally divided between the State and the "private agency," or that the gross proceeds paid into the treasury shall be returned to the agency after certain deductions are there made; or suppose that the State is to have the authority to require that sufficient means of transportation for all persons and prop-

erty to be carried shall be kept in readiness on the road, that so many trains of cars, of a designated character, shall regularly at stated times pass over the road; that the road shall be kept in repair at the expense of the corporation operating it, and without any expense to the State, and that as its "private profit" for rendering this service the "private agency" by which it is performed shall receive compensation from those who use the road at a rate not exceeding that which the State itself may from time to time prescribe. These, and an infinite variety of other methods which might be suggested, would be but different ways of effecting compensation for services rendered by a private agency in operating and maintaining a work of public use.  Of the propriety of the mode of compensation adopted in a particular case it is for the Legislature to judge, and we know no provision of the Constitution which is violated in the mode adopted here.

The legislative and executive departments of the Government seem to have deliberately reached the conclusion that a "public use" was to be promoted by the construction and operation of a railroad such as the Stockton and Visalia road is designed to be, and, even if in so doing they have abused or mismanaged the constitutional authority over the subject, that circumstance would afford no justification to us for the assumption of unauthorized powers for the correction of such abuses.

No amount of supposed public good to follow would excuse us for the usurpation of powers not belonging to the judicial department of the Government.  "There is always some plausible reason (says Bronson, J.) for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained by pushing the powers of Government beyond their legitimate boundary.  It is by yielding to such influences that Constitutions are gradually undermined and

finally overthrown. One step taken by the Legislature or the judiciary in enlarging the powers of the Government, opens the door for another that will be sure to follow; and so the process goes on until all respect for the fundamental law is lost and the powers of the Government become just what those in authority choose to call them." (3 Coms. 568.)

The power of the State Government to foster and regulate internal improvements is unquestionable. Should we, in this instance, deny to the legislative department the possession of this power, or should we attempt to narrow its clear constitutional scope by applying to it the arbitrary measure of our own views of wise policy in the conduct of public affairs, we would, in the hope of accomplishing a temporary good, permanently mar the symmetry of the structure of the Government itself, so far at least as a decision of ours could be permitted to work such an unfortunate consequence to the State. Though late events have awakened the general public attention to an anxious consideration of the extent of the legislative power upon this subject, those events have not as yet fixed a new limit to the power itself as it has heretofore existed, nor would they justify us in stepping aside from the well beaten track which we follow to tread upon the new and strange paths into which some, though few, of our brethren of the bench have, we hope, but temporarily wandered.

No propositions in the case can be affirmed with greater confidence than that, under Constitutions substantially like ours, railroads, though operated by private companies, are by mere legal conclusion, for "public use;" that the power of eminent domain, confessedly exercisible only in behalf of "public use," may therefore be exerted in behalf of railroads under legislative permission; that as fostering the "public use," aid may be extended to the construction of such roads by means of the power of eminent domain or of

subscription to capital stock, and by donations made by cities and other political subdivisions of the State, under the authority of the Legislature first given (or subsequently obtained, as was held in 1843 by the Supreme Court of Connecticut in *City of Bridgeport* v. *Housatonic Railroad,* 15 Conn. R. 475), and such is the purport of the judicial decisions of the highest Courts of Virginia, Connecticut, Pennsylvania, Ohio, Indiana, Tennessee, Illinois, Kentucky, New York, Georgia, Florida, Texas, Mississippi, Missouri, South Carolina, and other States. These decisions cover a period of little less than half a century of time; and they embody the views of constitutional law with reference to the question before us, which were entertained by some of the most distinguished jurists who have shed luster upon the American bench. They are cited in the briefs, and will be found to be not the mere expression of conclusions reached upon the points involved, but, in many instances, elucidated by a learning and research absolutely exhaustive of the general principle of the law of taxation as applied to the system of Government under which we live.

Upon authority, and upon principle as well, we think that the Act in question cannot be said, by us to be, in any sense, unwarranted by the Constitution, or beyond the authority of the Legislature to enact.

It is ordered that the writ of mandamus issue as prayed for.

CROCKETT, J., concurring:

I concur with Mr. Justice WALLACE in the result at which he has arrived, and for the most part in his reasoning; but without attempting an elaborate investigation of the questions discussed by him, I propose, nevertheless, to state, very briefly, the points which, in my opinion, are decisive of the action.

CAL. REPS. XLI—25

First—It is established by an unbroken current of decisions, by Courts of the highest authority in this country, that under the right of eminent domain lands held in private ownership may be taken for the use of private railroad corporations, on making compensation therefor; and that this is a *public* use, in the sense of that clause of the Constitution which permits private property to be taken by virtue of the right of eminent domain. This proposition is now too firmly established by a long and uniform series of decisions, to be overthrown or shaken, at this late day, except by an amendment of the Constitution; and if the taking of such lands for the use of a private railroad corporation is a *public* use, which justifies the exercise of the right of eminent domain on behalf of such corporations, I can perceive no reason whatever why taxation imposed to aid in the construction of the road is not for a *public* purpose. In the former case, though the land taken is devoted to the use of a private corporation, which owns and controls the road, and exclusively enjoys its emoluments, the use is, nevertheless, held to be public, in the sense of the Constitution, because one of the most important functions of government is to provide highways for the people, by which commerce is promoted and the general prosperity increased.

In the performance of this duty it is not doubted by any one that the State may itself construct these highways, and defray the cost of them out of the public treasury or by the imposition of a special tax for that purpose. No one questions that such a tax would be for a *public* purpose. But, instead of itself performing the work by its agents, employed and paid for that purpose, the State may avail itself of the aid, energy, and skill of private corporations, and construct highways which, in the opinion of the Legislature, will promote commerce, develop the resources of the county, and increase the general prosperity. It is on this theory only that the exercise of the right of eminent domain can

be invoked or justified on behalf of private railroad corporations. In such cases the land is deemed to be taken for a public use only because it is the duty of the State to provide such highways for the people; and it is the peculiar province of the Legislature to determine when and where such highways are necessary.

From its decision on this point there can be no appeal to the Courts, and the only remedy for an abuse of its powers in this respect must be found at the ballot box or in an amendment of the organic law. Assuming, therefore, that it is solely on this theory that the exercise of the right of eminent domain can be invoked on behalf of private railroad corporations (a proposition which I deem to be thoroughly well established both on reason and authority), I think it follows as a logical sequence that the same principal which enjoins upon the Legislature the duty of providing convenient highways for the people, and in furtherance of that end justifies the exercise of the right of eminent domain in behalf of private railway corporations, must, of necessity, authorize the imposition of taxes to aid in the construction of the road. If the use of the land taken is public, the purpose of the tax is also public, and for precisely the same reason, inasmuch as they both spring from and are founded on the duty of the State to provide highways for the public convenience, and are both intended solely to promote that object.

Both being designed to accomplish the same result, to wit, to promote the construction of a highway, which the Legislature, in the performance of its duty, has determined to be a work of public utility, and in furtherance of the public prosperity, if the use for which the land is taken is to be deemed a public use, I think it is impossible to resist the conclusion that the purpose for which the tax is levied is a public purpose. In respect to the question whether the use in the one case or the purpose in the other

is public or private, they stand on precisely the same footing, inasmuch as they both spring from the same public duty, and are both intended to promote the same public work of general utility. Nor does the fact that the road is to be owned and controlled by a private corporation, for its own emolument, any the more prove, or tend to prove, that the purpose of the tax is private, than the same fact would prove, or tend to prove, that the land was taken for a private and not for a public use, for the obvious reason that inasmuch as the ownership and control of the road is not one of the elements which enter into the question whether the use is public or private, it can have no effect, for the same reason, in determining whether the purpose of the tax is public or private. The object of the Legislature in permitting the land to be taken is not to benefit the corporation, but to promote the construction of a highway, which it deems to be a work of public utility; and, in like manner, the purpose of the tax is not to enrich the corporation, but to secure the construction of the road. If the corporation is incidentally, or even directly, benefited by the use of the land and money, the Legislature has, nevertheless, performed a public duty in thus providing a highway designed to promote commerce, and increase the general prosperity. On no other theory can the exercise of the right of eminent domain, in behalf of private railway corporations, be justified or defended, and a tax levied to promote the work stands on precisely the same footing.

Second—If any question of constitutional construction can be said to be settled by the weight of authority, it is, that under State Constitutions almost identical, in this respect, with our own, the Legislature has the constitutional power to authorize municipal corporations to subscribe for stock in private railroad corporations, organized to construct a road passing through, or terminating within, the territorial limits of the municipality; and to levy a tax to pay for such

subscriptions.  The decisions on this point run through a period of nearly forty years, and are not only very numerous, but almost uniform.  I shall not attempt to review or collate these authorities; and it is sufficient, on this point, to say that the power of the Legislature, under Constitutions similar to ours, in this respect, to authorize such subscription and tax, is now too firmly established in American jurisprudence to be either questioned or denied.

In very few of the States has this power been more broadly asserted, or more persistently maintained, than by the Courts of this State; and if the rule of *stare decisis* is to have any weight on such a subject, the question should be considered as no longer open to debate in this Court.  With an unbroken line of decisions on this point, running through so long a period, and emanating from Courts of the highest authority in this country, it is now too late to inquire whether the question has been settled properly or otherwise.  The repose and good order of society demand that when a question of this character has been firmly settled, by a long series of judicial decisions, it should not be opened to further discussion in the Courts.  In such cases, if the interpretation of a clause of the Constitution by the judiciary, which has been long acquiesced in, and repeatedly reaffirmed, shall be found to operate injuriously, it would be better to obviate the difficulty by an amendment of the organic law rather than to encounter the evils, which invariably flow from sudden and frequent changes in the construction by the Courts of constitutional provisions.  Assuming it, therefore, to be definitely settled, so far as judicial interpretation can settle such a question, that the Legislature has the constitutional power to authorize municipal corporations to subscribe for the stock of private railroad companies, and to levy a tax for the payment of such subscriptions, it only remains to be determined whether there is any difference in principle between a tax levied to pay for a sub-

scription to such stock and a tax raised for the purpose of
donating a sum of money to aid in the construction of the
road.   In the case of the subscription, the validity of the
tax can be maintained, I think, on no other solid ground
than that already indicated, to wit: that it is the duty, and
within the power, of the Legislature, to provide highways
for trade and travel; and, being the sole judge of the times
and places at which such highways are needed, it may aid
their construction, by means of subscription, by those muni-
cipal corporations through (and possibly near) whose terri-
torial limits the road will pass.   I am aware that in such
cases the validity of the tax has frequently been upheld,
partly on other grounds; and some of the decisions in sup-
port of the taxing power in that class of cases proceed on
the theory that the tax is for a public purpose, because,
by means of the subscription, the municipal corporation,
and consequently all the people within its limits, acquire a
proprietary interest in the road and its earnings, and are
entitled to a voice in its management.   But if the validity
of the tax is to rest on this theory only I think it could not
be maintained.   If the fact that the municipality is to have
a proprietary interest in the enterprise, and to participate in
its management, is to be the sole test by which to determine
whether the tax is for a public or private purpose, without
reference to the nature of the enterprise, it needs no argu-
ment to prove that municipal corporations and their mem-
bers—the people who compose them—are wholly at the
mercy of the Legislature, and hold their estates only by its
sufferance.   If the Legislature should determine it to be
necessary that a town or city should have a beet-sugar
manufactory, a wholesale clothing store, a dozen iron
foundries, and several pianoforte manufactories, and should
direct the corporation to subscribe for stock in private com-
panies, organized to accomplish these enterprises, and to
levy a tax on all the people of the municipality to pay for

the stock, it is obvious that the people might thus be compelled, against their will, to embark their estates in purely commercial enterprises, on the plea that in the opinion of the Legislature the public would derive some incidental benefits therefrom. In such a case, if the question whether the tax is for a public or a private purpose is to be determined solely by the fact that the municipal corporation is to have a proprietary interest in the contemplated enterprise, and to participate in its management, irrespective of the public or private nature of the enterprise itself, it is obvious that under so broad a construction of the Constitution all restraint would be practically removed from the power of the Legislature over the property and estates of the people. It might compel the inhabitants of towns, cities, or counties, without their consent, to invest their capital in commercial enterprises of perhaps more than doubtful expediency, and with a moral certainty that the investment would prove disastrous. I think the framers of the Constitution could not have intended to confer upon the Legislature, under the taxing power, a discretion so wholly devoid of restraint, and so capable of gross abuse. The extent of its power over municipal corporations, in respect to taxation, is not to be measured by the fact that the corporation is or is not to have a proprietary interest in the enterprise to be promoted by the tax, but depends on wholly different considerations, having no relation to that question.

If the work to be accomplished be confessedly of a public nature, as contradistinguished from a private enterprise, there can be no doubt of the constitutional power of the Legislature to promote its construction by contributions from the public treasury; or if the work be local, then by authorizing the particular municipality in which the proposed improvement is located, to aid it by subscriptions of stock, to be paid for by taxation; and, as already stated, this proposition is now too firmly established to admit of debate. But

it proceeds on the theory that the subscription is intended, not simply as a profitable investment of the funds of the municipality, but solely for the purpose of promoting the construction of a highway for trade and travel. Though the subscription may directly benefit the railway corporation, and though the investment may possibly prove profitable, these are not the primary objects of the tax, but only incidental to the main purpose, which is to secure the construction of the road. If it were known in advance that the stock would be utterly valueless in the market, and that the road would never pay a dollar in dividends, this would in no degree impair the validity of the tax, the main object of which was to secure the construction of the road as a convenience for trade and travel, to enhance the value of contiguous property, and to increase the general prosperity. This being the primary object of the tax, the benefit to the railway company, and the investment of the funds of the municipality in the stock, are only incidents which in no wise affect the purpose of the tax, or prove it to be for a public or private purpose. The sole purpose of the tax being to secure the construction of the road, which is undeniably a public purpose, it is none the more so because the money raised by the tax is invested in stocks of the company, nor any the less so because the railway corporation derives a benefit from the investment. Neither of these considerations touches the question of the primary purpose for which the tax was raised, to wit: to promote the construction of the road. If these views be correct, it results as a logical sequence that if money be raised by taxation to be donated to the railway company, for the sole purpose of securing the construction of the road, the purpose of the tax would be none the less public than if the same result was accomplished by an investment of the money in the stock of the company. My conclusion, therefore, is that the

Act of the Legislature in question does not violate the Constitution.

It cannot be denied that it is extremely difficult to define, with exact precision, the line which limits the constitutional power of the Legislature in authorizing the imposition of taxes by municipal corporations, to promote the construction of local improvements by private persons or corporations; and it is obviously a power which is capable of great abuse. That it has been frequently and grossly abused in some of the States of the Union is attested by the enormous debts which have thus been created, and the popular discontent which has ensued. In several of the States the evils resulting from legislation of this character had become so intolerable as to lead to amendments of their Constitutions, limiting or clearly defining the powers of the Legislature in this respect; and this is, manifestly, the only effective remedy. In a popular Government, like ours, where the tenures of office are short, and changes are constantly occurring in those who make and administer the laws, the only security against such abuses will be found in an amendment of the organic law. Under its existing provisions the Courts are, in a great measure, powerless to remedy the evil.

Sprague, J., concurring:

I concur in the order solely upon the ground that I cannot now regard the questions involved in this case as open questions in this State under our Constitution as it is. This Court having, by a uniform line of decisions, commencing with *Patterson* v. *Marysville*, 13 Cal. 175, sustained and sanctioned laws substantially obnoxious to the same constitutional objections as the statute involved in this case, the questions should be considered settled. Could I regard the questions involved as original in this State, I should not hesitate in

denying the order asked by the petitioner, notwithstanding the long array of authorities from other States to the contrary.

TEMPLE, J., concurring:

I concur in the order made in this case solely upon the ground that I regard the question as settled by the previous decisions of this Court, as well as by the almost unbroken current of authorities in other States. I differ from much of the reasoning of my associates, and if the question were new, should be inclined to agree with the respondent upon the main question discussed. To overturn the almost unbroken line of decisions now, however, would not establish a rule of decision, but would make an exception merely, in the current of authorities. It would shake the confidence of every one in the stability of judicial decisions, and would add nothing to the force of the limitations upon legislative power. The people can readily circumscribe this power without doing violence to established precedents or destroying the confidence of the community in that branch of the Government which should be least influenced by popular pressure.